THE LICHENS COMPANY, a corporation of the State of Delaware,

*vs.*

THE STANDARD COMMERCIAL TOBACCO COMPANY, INCORPORATED, a corporation of the State of Delaware.

*New Castle, December 21, 1944.*

*Aaron Finger,* of the firm of Richards, Layton and Finger, for complainant.

*Edwin D. Steel, Jr.,* of the firm of Morris, Steel and Nichols, for defendant.

HARRINGTON, Chancellor: The complainant, a stockholder of the defendant, a solvent corporation, seeks to have a receiver appointed to wind up its affairs, alleging fraud and mismanagement by its officers and imminent danger of loss of property which might cause insolvency.

The demurrer raises two questions:

(1)   Does the Court of Chancery have the inherent power, upon the application of a minority stockholder, to wind up the affairs of a solvent corporation and to appoint a receiver for that purpose because of fraud and gross mismanagement by its officers?

(2)   If it has that power, are the allegations of the bill sufficient to justify the appointment of a receiver?

It appears from the bill that the Standard Commercial Tobacco Company, Incorporated, the defendant, was organized in this State in 1916, with an authorized common stock issue of 1,000,000 shares, each having a par value of $1, and of which 434,491.7 shares have been issued and are outstanding. The complainant, also a Delaware corporation, owns 8,600 shares of that stock which were transferred to it on or about August 25th, 1942, and prior thereto had been owned for several years "by the persons in interest beneficially in complainant." The defendant was incorporated for the primary purpose of engaging in the tobacco trading business and in business enterprises germane thereto, and upwards of

$4,000,000 of capital has been invested in that corporation. From the time of its organization in 1916 until April 15th, 1938, one Ery Kehaya had working control of the corporation, controlled its officers and directors in the conduct of its affairs, and dominated it as though it were wholly owned by him. During that time, as a result of various acts of mismanagement, the defendant was reduced to a state of insolvency, and, on April 15th, 1938, filed a petition in the United States District Court for the Southern District of New York, under *Section 77B* of the *Federal Bankruptcy Act,* 11 *U.S.C.A.* § 207. Its principal assets then consisted of 80,610 shares of the common stock of the Axton-Fisher Tobacco Company, which were carried on its books at the cost value of $2,960,268.25. All, or at least the most, of that stock was then pledged, or subject to a lien for the unpaid balance of the purchase price, the exact amount of which balance is unknown to the complainant, but it believes that it amounted to upwards of $500,000. The Federal Court proceeding was substantially closed on April 8th, 1942, following the entry of an order on that date and of previous orders, under which *inter alia* the said 80,610 shares of B stock of the Axton-Fisher Tobacco Company were sold for $1,000,000, and the proceeds used to discharge the lien on said shares of stock, and to pay the claims of other creditors of the defendant. After that proceeding had terminated, the defendant corporration was no longer insolvent, but its losses, by reason of the mismanagement of the said Ery Kehaya, had been so great that it was left with no assets except about $130,000 in cash and some other assets of doubtful value, including some choses in action. The Securities and Exchange Commission had become a party to the Federal Court proceeding, and presented an analysis of two plans of reorganization, which was set out in the bill. In it, the statement was made that

"Under the presidency of Mr. Kehaya, Standard took part in several transactions which were not germane to its customary operations as a tobacco trading concern or as an investor of marketable

securities, and these operations resulted in substantial losses, aggregating more than a million dollars."

In a report, dated March 14th, 1942, filed by a special master in the Federal Court proceeding, and also incorporated in the bill, the statement is made that "About 140,000 shares (of the stock of Standard) are owned or controlled by the family of Ery Kehaya."

Upon the termination of the Federal Court proceeding, Grace Kehaya, the wife of Ery Kehaya, was the owner of a large block of stock of the defendant corporation which she had purchased during the course of the proceeding, and as a part of a transaction approved in said proceeding. Ery Kehaya is president, and in charge of the management, of the defendant corporation. Treating Grace Kehaya's holdings of stock in that corporation as supporting his management of its affairs, Kehaya is, and since the termination of the said court proceeding, has been, in working control of Standard Commercial Tobacco Company, Inc. During the long period of his control, that corporation has been so far denuded of its property that it no longer has sufficient assets to enable it to carry on the business for which it was organized, and for which its capital was supplied, with any hope of profit or benefit to its stockholders; and the relatively small amount of its said assets, nearly all in cash, constitutes a fund which it is dangerous to leave under the control of Kehaya. Since the termination of the said court proceeding, the complainant has endeavored to ascertain what business has been carried on by the defendant, but without success. By letter to the defendant, dated November 27th, 1942, and incorporated in the bill, the complainant asked: (1) for a "financial statement as of November 1, 1942," (2) for an "operating statement of the same date," (3) "* * * the nature of any investments or operations which had been made, or are being made," and (4) "the present fixed overhead * * * per month." The complainant received no reply.

The complainant then alleges:

(1) That by reason of the long record of mismanagement of the defendant corporation by Ery Kehaya, resulting in its insolvency, there is danger that it will again be made insolvent;

(2) That Kehaya's acts of mismanagement have brought the defendant to a condition where it can no longer carry on the business for which it was organized, with reasonable prospect of profit to the corporation and its stockholders;

(3) That complainant has received no report or information of any kind as to what has become of the said sum of $130,000 which was in the defendant's treasury when it came back into the control and management of Kehaya, and so far as it knows, the stockholders, generally, are without such information, and complainant believes that such fund and the remaining assets of the corporation are in imminent danger of loss;

(4) That the choses in action, heretofore referred to, include claims, the enforcement of which should not be under the control of Kehaya; and

(5) That the only hope of complainant and other stockholders of salvaging anything out of the defendant is through the appointment of a receiver.

The complainant also alleges that among the transactions in which the Standard Commercial Tobacco Company, Incorporated, engaged under the direction and control of Ery Kehaya before the filing of the Federal Court proceeding, and which resulted in substantial losses, were:

(1) An arrangement with Standard Commercial Export & Finance Corporation, hereinafter referred to as "Standex," the stock of which was wholly owned or controlled by Ery Kehaya, whereby at various times between the years 1928 and 1938, the defendant sold leaf tobacco to

Standex. Under that arrangement, Standex paid only a portion of the purchase price, and was to pay the balance to the defendant after resale.

Resales by Standex at a profit were contemplated, which would, therefore, enure to the benefit of the said Ery Kehaya personally. The defendant not only lost the profits which Standex received from such resales, but also lost more than $200,000 which represented the unpaid balances for the tobacco sold. No part of this debt is collectible from Standex; that corporation having been dissolved and being practically without assets.

(2) In or about 1933, Ery Kehaya purchased certain shares of stock in Enossis Publishing Company, which published the "National Herald," a Greek newspaper, and paid $50,000 therefor. In or about 1934 the publishing company was in financial difficulties and a receiver was appointed for it by the Supreme Court of the State of New York, with the resulting threat of the loss of Kehaya's investment in its stock. Kehaya caused the defendant to advance approximately $40,000 to a corporation called Standard Commercial Trading Corporation, the stock of which was owned by the defendant. He also caused the trading corporation to purchase all of the assets of the publishing company from the receiver for approximately $40,000. He then had the trading corporation organize another corporation called National Herald, Inc., with a capital stock of 20,000 shares, having a par value of $5 per share, to which all of the assets acquired from the Enossis Publishing Company were transferred in consideration of the issuance by National Herald, Inc., to the trading corporation of 20,000 shares of its capital stock, together with a bond of National Herald, Inc., for $100,000, secured by a chattel mortgage on all of its assets. Shortly thereafter, Kehaya caused the trading corporation to donate 11,000 shares of the National Herald, Inc., stock to the treasury of that corporation, and almost immediately thereafter he purchased those shares for $3,000. Kehaya was then

president and director of National Herald, Inc., of the Standard Commercial Tobacco Company, the defendant, and of the trading corporation, and controlled them. When he caused the trading corporation to donate the 11,000 shares of National Herald, Inc., stock to its treasury, he did not disclose either to the board of directors of the defendant or to the board of the trading corporation that he proposed to purchase that stock personally for $3,000.

(3) During the year 1936, Kehaya and Standex borrowed substantial sums of money from various brokers and pledged shares of common stock of the defendant corporation as security therefor. In order to protect said loans against calls for additional margins and to "peg" or increase the price of the common stock of the defendant, Kehaya caused it to purchase shares of its stock in the open market, and agreed with various jobbers that the defendant corporation would carry such stock for their account until the market price had reached the sum of $25; at that time the stock was to be turned over to the respective jobbers at cost, plus carrying charges. Under these arrangements, the defendant purchased approximately 24,800 shares of its own common stock in the open market at prices which averaged about $11 per share. A substantial part of these shares was sold by Kehaya or Standex, and the prices paid therefor by Standex would have been obtainable if said purchases had not been made by the Standard Commercial Tobacco, Inc., the defendant. The stock then purchased by the defendant never reached the market price of $25 and none of said stock was acquired by any of the jobbers with whom the arrangements were made. As a result of the steps taken by Kehaya, in connection with said stock sale transactions, he was indicted in the United States District Court for the Southern District of New York in 1941 upon a charge of having violated the anti-manipulative provisions of the Securities and Exchange Act, and pleaded guilty to the indictment.

(4) In 1929, while Kehaya was in Germany, he purchased

a cigarette factory in the name of a Swiss corporation, having 15 shares of stock, of which he owned 10, and one Farber, then treasurer of the defendant corporation owned the other five. Later in the same year, Kehaya made this transaction, one for the account of the defendant corporation. The German factory was closed about 1933, and the defendant's loss was upwards of $500,000.

(5) In 1933 or 1934, Kehaya caused the defendant corporation to enter into a gold mining venture. Within two years, it was abandoned and the defendant suffered a loss of about $60,000.

(6) In 1937, Kehaya borrowed for his own personal use $90,000 from one of the defendant's customers and upwards of $26,000 from another customer. The defendant later made purchases amounting to more than $150,000 from the customer who had made the $90,000 loan.

The obvious purpose of the bill is to wind up the affairs of the corporation on the ground of fraud, and gross mismanagement amounting thereto, by its officers.

The appointment of a receiver for the protection of property is one of the oldest remedies in equity. *Pennsylvania Steel Co. v. New York, etc., Co.,* (2 *Cir.*) 198 *F.* 721, 736; *Hopkins v. Worcester, etc., Canal,* L. R. 6 *Eq.* 437; 4 *Amer. Jur.* 14. But it is a remedy of an auxiliary and incidental nature, and cannot be the only real relief sought by the bill. *Hopper v. Fesler Sales Co.,* 11 *Del.Ch.* 209, 99 *A.* 82; *Lewis v. Commonwealth Sec. Inc.,* (*D.C. Del.*) 51 *F. Supp.* 33; *Securities & Exchange Comm. v. Fiscal Fund,* (*D.C. Del.*) 48 *F. Supp.* 712; *Orth v. Transit Invest. Corp.,* (3 *Cir.*) 132 *F.* 2d 938.

The inherent right of a court of equity to appoint a receiver *pendente lite* in appropriate cases, in order to preserve the property involved in the litigation, has been recognized since an early date. *Skinner v. Educational Pictures*

*Securities Corp.*, 14 *Del.Ch.* 417, 129 *A* 857; *Salnita Corp. v. Walter Holding Corp.*, 19 *Del.Ch.* 426, 168 *A* 74; *Cahall, Rec., v. Lofland et al.*, 12 *Del. Ch.* 125, 107 *A.* 769. It seems that the right of that court to appoint a receiver to wind up the affairs of a corporation, on the ground of insolvency alone, was not recognized in the early English equity jurisprudence (4 *Amer.Jur.* 36; 40 *Col.Law Rev.* 220) ; but, by statute in this State, a receiver may be appointed for an insolvent corporation "on the application and for the benefit of any creditor or stockholder." *Rev.Code* 1935, § 4407; *Cahall, Rec. v. Lofland, et al., supra; Mackenzie Oil Co. v. Omar Oil & Gas Co.*, 14 *Del.Ch.* 36, 120 *A.* 852. Moreover, when Delaware became a state, the English Court of Chancery would not entertain a bill, filed by a minority stockholder to wind up the affairs of a solvent corporation and appoint a receiver for that purpose, on the ground of fraud and gross mismanagement by its officers, though material losses were imminent and could not be otherwise prevented (*Myers v. Occidental Oil Corp.*, (*D.C. Del.*) 288 *F.* 997; 4 *Amer. Jur.* 51; 40 *Col. Law Rev.* 220) ; but in recent years there has been a growing tendency in this country to recognize that inherent right under special circumstances of great exigency. *Securities & Exchange Comm. v. Fiscal Fund, supra; Maxwell v. Enterprise Wall Paper Co.*, (3 *Cir.*) 131 *F.* 2d 400; *Thoroughgood v. Georgetown Water Co.*, 9 *Del. Ch.* 84, 77 *A.* 720; 43 *A. L. R.* 242, 244, 288, 317; 16 *Fletcher, Cyc. Corp.*, (*Perm. Ed.*) § 7714; 4 *Pomeroy, Eq. Jur.*, (*4th Ed.*) §§ 1540, 1541.

In the *Fiscal Fund case* [48 *F. Supp.* 715], Judge Leahy aptly said:

"There is a well-established power in the Federal Court sitting as a court of equity to order liquidation of a solvent corporation when there is no other course available to remedy a situation which is inequitable to the stockholders."

The *Thoroughgood* case [9 *Del. Ch.* 84, 77 *A.* 723], also contains the following dictum:

"But courts of equity do independent of statute appoint receivers of corporations, and through them do take possession of the property of the corporation to administer their affairs, enjoin interference by their officers, collect their assets, convert their property into money, wind up their affairs and distribute the assets among the creditors and stockholders. These powers are exercised with great caution and only as exigencies of the case appear * * *. It will be found that the basis of such interference is gross mismanagement, positive misconduct, or other grounds showing a breach of trust on the part of the officers of the corporation, and probably, except in rare cases, only when insolvency has resulted from such misconduct."

It therefore seems apparent that *Myers v. Occidental Oil Corp., supra,* is not in accord with the trend of the more recent cases. The cases directly in point are not numerous, but there are many judicial statements which recognize that rule. Whatever adverse inferences may be drawn from the general statements in *Cahall v. Lofland, et al., Mackenzie Oil Co. v. Omar Oil & Gas Co.,* and *Skinner v. Educat. Pict., etc., Corp., supra,* there are no direct decisions in Delaware on that question.

Differing from derivative corporate actions brought by stockholders, the complainant's alleged rights are of a personal nature. 40 *Col. Law Rev.* 220, etc. The real primary relief sought by the complainant is based on an alleged violation of certain fiduciary obligations by the officers and controlling stockholders of the corporation to the minority stockholders; the appointment of a receiver being merely incidental thereto. *Thoroughgood v. Georgetown Water Co., supra; Miner v. Belle Isle Ice Co., et al.,* 93 *Mich.* 97, 53 *N.W.* 218, 17 *L. R. A.* 412; 40 *Col. Law Rev.* 220, etc. The fact that the corporation is the sole defendant in this action is, therefore, unimportant. See *Securities & Exchange Comm. v. Fiscal Fund, supra; Sellman v. German Union Fire Ins. Co.,* (C.C.) 184 *F.* 977. *Lewis v. Commonwealth Securities Inc., supra,* is not inconsistent with that conclusion.

Fundamental principles will be seldom disregarded by a court of equity, but in general its function is to give such

relief as justice and good conscience may require, and under the changing conditions of society and the increasing number of corporate enterprises, its powers are not necessarily limited by a lack of early precedents. See 1 *Pomeroy Eq. Jur.*, (*5th Ed.*) 78, 81. Originally, jurisdiction to appoint a receiver, in order to wind up a solvent corporation, was largely denied on the theory that it was equivalent to a decree for dissolution, which was generally within the sole province of the legislative body. 43 *A. L. R.* 244, 288.

Particularly when corporate charters are granted by law, as in this State, there seems to be little reason for the application of that rule. Technically at least the appointment of a receiver does not dissolve the corporation (*Haas v. Sinaloa Explor. & Develop. Co.*, 17 *Del. Ch.* 253, 152 *A.* 216; *Badenhousen Co. v. Kidwell*, 12 *Del. Ch.* 370, 107 *A.* 297), and no such decree is sought by the complainant.

But, conceding the inherent power of a court of equity to appoint a receiver for a solvent corporation, as we have seen, the right must be exercised with great caution, and only when there is real imminent danger of material loss that cannot be otherwise prevented. *Thoroughgood v. Georgetown Water Co., supra; Salnita v. Walter Holding Corp., supra.* In other words, some beneficial purpose must be clearly served thereby. *Id.* Nor will a court of equity appoint a receiver to wind up a corporation because of mere errors of judgment in business management. *Securities & Exchange Comm. v. Fiscal Fund, supra.*

Applying these principles, the appointment of a receiver for the defendant is not justified. The misconduct relied on was between 1928 and 1938, or from four to fourteen years before the bill was filed, and no real imminent danger of loss appears. Under the facts alleged and admitted by the demurrer, mere apprehension of future misconduct is not enough. See 16 *Fletcher, Cyc. Corp.*, (*Perm. Ed.*) § 7724. The complainant is entitled to reasonable information relating to the activities and financial con-

dition of the corporation, but the failure of its officers to furnish it will not justify the appointment of a receiver. See 16 *Fletcher, Cyc. Corp.,* (*Perm. Ed.*) § 7729; 4 *Pomeroy's Eq. Jur.,* (*4th Ed.*) § 1452.

The demurrer is sustained and an order will be entered accordingly.