Martin J. WHITMAN, directly as a Director of the Cyprus Corporation and derivatively as a stockholder on its behalf, Plaintiff,

v.

J.B. FUQUA, Joseph P. Kazickas, Robert Redfearn, Willard F. Rockwell, Jr., Don N. Stitt, and the Cyprus Corporation, Defendants.

Civ. A. No. 82–516.

United States District Court, W.D. Pennsylvania.

Oct. 14, 1982.

Paul Titus, Pittsburgh, Pa., for plaintiff.

Gilbert J. Helwig, Pittsburgh, Pa., Daniel S. Greenfeld, New York City, for defendants.

## OPINION

ROSENBERG, District Judge.

This action by the plaintiff, Martin J. Whitman, for various equitable remedies, comes as a sequel to that at Civil Action No. 82–28, in which the plaintiff brought an action against the Cyprus Corporation and other defendants, and particularly the principal director of that corporation, Willard F. Rockwell, Jr. In the instant action the defendants are: J.B. Fuqua, a previous director of the corporation and the person who sold substantial blocks of stock to the interest in the corporation controlled by Rockwell; Joseph P. Kazickas, a current director representing the common stock interests and member of the Executive Committee; Robert Redfearn, a previous director of Cyprus; Rockwell, Chairman of the Board of Directors and the other member of the Executive Committee, Don N. Stitt, the president of the company and Cyprus Corporation, itself.

The defendants are being charged with not only non-compliance with the law applicable to the control and conduct of the corporation, but as well with an attempt to defeat a vote of the stockholders at the election of March 12, 1982. At this election the plaintiff campaigned and succeeded in electing 4 directors to represent the interests of the preferred stockholders who defeated the defendants' slate of preferred candidates, while the defendants elected 4 directors (who ran unopposed) to represent their interests, the common stockholders.[1] Additionally, at this election, two proposals

---

1. The various conflicting situations here most likely arose because of the constitution's provision for equal representation of 4 directors for the preferred stockholders and 4 directors for the common stockholders. Plaintiff's Exhibit 26 and Defendants' Exhibit A, pp. 48–49.

Articles 3 and 4, originated by the defendants' group to amend the constitution of the corporation were defeated by the efforts of the plaintiff.

The first action dealt principally with proxy notice. The charge by the plaintiff was that the stockholders were not being properly informed as to potential conflicts of interest among the defendants' slate of candidates, and that the proxy solicitation of the Rockwell group was in part false and misleading. At conferences with this court, the defendants agreed to and did send sufficient notice by a supplemental proxy; and to accommodate this, the court postponed the meeting scheduled for January 19, 1982 to March 12.

On March 16th, the inspectors of the election announced the results of the election. The 4 directors proposed by the plaintiff Whitman to represent the preferred stockholders were elected with 4 directors for the common stockholders proposed by the Rockwell group.

On March 17th, the Chairman of the Board, Rockwell, instructed the president, Don Stitt, to call an immediate meeting of the old directors at Fort Lauderdale, Florida,[2] without indicating any purpose for the call, as far as the record shows.

On March 19th, the inspectors of the election certified the results, which they had previously announced on March 16th, and on that date, the meeting which Rockwell had instructed to be called, was held by the old directors at 1:00 p.m. in Fort Lauderdale. At that meeting specific action was taken according to the minutes and testimony of witnesses:

1. *Reconfirmed* the appointment of Rockwell and Kazickas as the members of the Executive Committee, and appointed alternate members in the event of death, resignation, disability, or disqualification;

2. *Reconfirmed* the appointment of Kazickas to the Audit Committee along with a member of the preferred directors;

3. *Appointed* a Secretary, Assistant Secretary, Treasurer, and Assistant Treasurer;

4. *Approved* the acquisition of operating companies by Cyprus Corporation through a subsidiary, Pittsburgh Cyprus Corporation and appointed Rockwell, Stitt and Wick as officers of this subsidiary. The financing arrangements for these acquisitions required only approval from the Executive Committee; and

5. *Approved* the employment contracts of President Stitt and Vice President Wick, and fixed their salaries.

Other corporate actions were taken but the pertinent and significant actions in corporate fashion were those here particularly enumerated.

The complaint for the instant action was filed March 29th, after the plaintiff learned of the Fort Lauderdale meeting, and on June 18th, the plaintiff filed a supplemental complaint. The defendants filed answers and denied the averments of the plaintiff and that the circumstances required any judicial remedy. The plaintiff, inter alia, charged that the sum of $100,000 was being spent without appropriate Board action on a contract with Drexel Burnham Lambert, and that there was the possible liability or expenditure of a much larger sum in the future; that this was uncalled for; and that it was brought about in part by the influence which may have occurred by reason of the fact that one of the counsel for Drexel was also defense counsel for Cyprus. The plaintiff sought by motion to have this mutual counsel disqualified. At this time I took notice of the circumstances but denied the motion and held it in abeyance in order to permit the plaintiff to raise it at any time in the future.

The questions preliminarily before this court are first, was the meeting at Fort Lauderdale legal, and if legal in part, *ultra vires?* Was the action at that meeting intended to nullify or neutralize the election of March 12th? Was the action at that

**2.** The principal corporation is at Pittsburgh, Pennsylvania, at Number Two Chatham Center.

meeting intended to disable the newly elected directors representing the preferred stockholders or to deprive them of the capability of acting within the authority empowered them by law? Was the action at that meeting intended to reverse the action of the voters at the March 12 meeting by which they negatived proposals 3 and 4, and so permit the Rockwell group to change the character of the Cyprus Corporation against the will and knowledge of the owners of stock?

These questions raise highly critical issues, which this court must in good conscience first determine to provide such equitable remedies as may be required for the stockholders of 32 million shares of common and preferred stock. Thus, I look at not the elected directors' personal or financial interests alone, but facts to be aware of in order to protect the financial interests of those unseen owners of stock who are not present in the courtroom before me.

To make these determinations it is imperative that I make certain findings of fact from the record and from the evidence presented before me at the hearings on July 26–28, 1982, and from the stipulation filed by the parties on August 16, and also from my observations and inferences drawn from all the evidence presented in the case and circumstances before me.

Donald Stitt is president of Cyprus as he had been previously appointed and reconfirmed or re-appointed at the Fort Lauderdale meeting, and he resides in and maintains a business office within the Western District of Pennsylvania. Rockwell with his partisan associates acquired power and control in various ways. He became the majority stockholder by a single purchase of stock in September, 1981. They purchased the controlling interest of approximately 17% of outstanding common stock for approximately $4,300,000. Thereupon Rockwell was appointed a member of the Board of Directors with the understanding that Fuqua, the seller, would additionally appoint whomever Rockwell wanted (Exhibits 11 and 52). Rockwell also resides in and maintains a business office within the Western District of Pennsylvania.

The Cyprus Corporation was and is now a non-diversified close-end investment company[3] registered under the Investment Company Act of 1940, and maintains its principal management offices at Two Chatham Center, Pittsburgh, Pennsylvania. It deals primarily with investments in stocks, bonds and other financial instruments. These are principally conservative, highly-liquid investments which provide steady income without speculation or great risk of loss.

Articles 3 and 4 by which the Rockwell group proposed to amend the constitution, would have converted the character of the corporation into one which would have permitted its officers to become more speculative and to invest in less secure commodities than theretofore with greater risk of loss.

The argument by the defendants regarding the future of the corporation was that there would be a greater chance of profit with the amount of risk which would be involved in more speculative acquisition operations and thus there would be an increase in the value of all stock. This, the plaintiff contended, would create greater value for the owners of common shares of stock, but it would involve greater risk for the preferred stockholders, and any such actions would need to be closely scrutinized by the preferred directors.

At the time of the hearing before me, the value of common stock on the open market was $⅜ and the value of preferred was $12.25.[4] The defendants have asserted that the corporation's post-election investment strategy has continued to be conservative at least during the time of this proceeding.

█ In the instant complaint and the supplemental filing, the plaintiff charges that:

The defendants determined by means of an unlawful plan to subvert the court's order providing for an election and undo the election, itself;

---

3. See 15 U.S.C. § 80a-5 and No. 1 of Stipulation of Undisputed Facts.

4. Plaintiff's Exhibit 18.

That pursuant to such a plan, the five defendants met in Fort Lauderdale, Florida on March 19, 1982 after the inspectors had certified the results of the March 12 election;

That there the defendants held a clandestine meeting, incorrectly described by them as a "Regular Meeting of the Company's Board of Directors";

That this meeting was not a meeting of the Company's Board of Directors, since six of the eight directors elected by the stockholders on March 12th were not in attendance and were unaware of the meeting;

That two of the five participants, defendants Fuqua and Redfearn, were no longer directors, and another participant, defendant Stitt, never served as a director;

That such a meeting was referred to by the plaintiffs as the "Bogus March Meeting";

That from September 8, 1981 until plaintiff Whitman's preferred stock nominees took office, the company's Board of Directors was unlawfully and illegally constituted, as less than 50% of the Board was comprised of preferred stock representatives;

That since the Board was improperly constituted, the "Bogus March Meeting" was invalid also for the additional reason that at the time the "Bogus March Meeting" took place, the defendants were aware that the company's preferred stockholders had rejected the Rockwell preferred stock nominees and elected Whitman's preferred stock nominees; and

That at the "Bogus March Meeting", the defendants passed a resolution determining that all future resolutions of the company's Board of Directors would have to be passed by an affirmative vote of five out of eight directors of the company, in an attempt to frustrate the known will of the company's preferred stockholders as expressed through the certified results of the inspectors of election, and to perpetuate the Rockwell partnership's power in order to further the interests of the Rockwell partnership.

I find at the Fort Lauderdale meeting, the defendants improperly "authorized" the following acts: (a) attempted to secure for the defendants, Rockwell and Kazickas, virtual lifetime positions as members of the Executive Committee; (b) authorized the formation of a subsidiary which would be empowered to acquire operating companies, with such subsidiaries to be capitalized with up to 25% of the company's total assets; (c) appointed directors for such subsidiary; (d) gave the Executive Committee exclusive authority to approve financing arrangements by the subsidiary; and (e) approved employment contracts for defendant Stitt and another officer.

All of the action at the Fort Lauderdale meeting, I find was legislative in character required to be administered by authority of a properly constituted Board of Directors. I find that the new Board of Directors was duly elected on March 12 and qualified to function under the corporate constitution and the law, and that they were known to be so on March 16 and were qualified as of that date. Corroboration of such election and qualification was made on March 19, as was well known by the defendants who participated in the Fort Lauderdale meeting. I conclude as a matter of law that knowing the facts as the defendants did, prior to the Lauderdale meeting, and participating as they did, that they did so for personal reasons and not corporate reasons to benefit the stockholders or the director most recently elected by the preferred stockholders. I hold that such action was neither authorized by corporate processes or the law, therefore either or both *ultra vires* or illegal.

It is admitted by the defendants and I find as a further fact that on June 10, the defendants Rockwell and Stitt, acting without Board authority, caused the company to enter into a contract with Drexel Burnham Lambert, Incorporated, an investment firm. The contract obligated the company to pay $100,000 immediately to Drexel (which was paid) and under certain circumstances set forth an additional $200,000 for an aggregate consideration of $300,000. Drexel was commissioned to develop a plan of recapital-

ization which would eliminate the preferred stock. If the plan should be presented to the stockholders, Drexel would receive an additional $50,000. If the plan was to be approved by the stockholders, Drexel would receive another additional $150,000.

Drexel is the adviser to a substantial preferred stockholder who in the proxy contest revoked his vote for the Rockwell preferred stock nominees. That vote constituted the margin of victory. The defendants, the Rockwell faction, in selecting Drexel and paying it the very generous compensation for at the most a few weeks work, contingent upon the stockholders' approval of the plan of reorganization, give the appearance of using the company's money in an attempt to gain the good will and support of Drexel.

The defendants were not authorized under the company's by-laws and the laws of the State of Delaware, where Cyprus is incorporated, to enter into the contract with Drexel. The circumstances were aggravated by the fact that the defendants were aware of the fact that at least 50% of the Board of Directors, the entrusted representatives of the proprietary preferred stock, would not approve the contract with Drexel because of the expense involved and their ulterior purpose. Accordingly, the defendants' action constituted misconduct in office in violation of § 36(a) of the Act.[5]

Under the contract, Drexel may be rendering investment advice and acting as an investment adviser or sub-investment adviser to the company. Under §§ 15(a) and (c) of the Act, the contract must be approved by the Board of the company and its stockholders.[6] The action of the defendants, Rockwell and Stitt, in authorizing and executing the Drexel contract, may have violated the Investment Act of 1940.

## LAW

In the prior action the parties stipulated that the law of Delaware applied because Cyprus was incorporated in the State of Delaware, but the parties have not so agreed in this sequel action. However, since Cyprus was incorporated in the State of Delaware, I conclude that the law of Delaware will apply where local law affects corporate action, and federal law will apply where federal law applies as relates to such financial institutions, as the one involved in this case. Additionally, I conclude that the plaintiff does fairly and adequately represent the interests of the stockholders, particularly those who hold the preferred stock.

The defendants early filed a motion to dismiss this action on jurisdictional grounds. I concluded at the hearing that the court

---

**5.** § 36(a). "The Commission is authorized to bring an action in the proper district court of the United States, or in the United States court of any territory or other place subject to the jurisdiction of the United States, alleging that a person serving or acting in one or more of the following capacities has engaged within five years of the commencement of the action or is about to engage in any act or practice constituting a breach of fiduciary duty involving personal misconduct in respect of any registered investment company for which such person so serves or acts—

(1) as officer, director, member of any advisory board, investment adviser, or depositor; or

(2) as principal underwriter, if such registered company is an open-end company, unit investment trust, or face-amount certificate company."

**6.** 15 U.S.C. 80a–15(a) and (c): (a) "It shall be unlawful for any person to serve or act as investment adviser of a registered investment

company, except pursuant to a written contract, which contract, whether with such registered company or with an investment adviser of such registered company, has been approved by the vote of a majority of the outstanding voting securities of such registered company, . . ."

(c) In addition to the requirements of subsections (a) and (b) of this section, it shall be unlawful for any registered investment company having a board of directors to enter into, renew, or perform any contract or agreement, written or oral, whereby a person undertakes regularly to serve or act as investment adviser of or principal underwriter for such company, unless the terms of such contract or agreement and any renewal thereof have been approved by the vote of a majority of directors, who are not parties to such contract or agreement or interested persons of any such part, cast in person at a meeting called for the purpose of voting on such approval. . . ."

had jurisdiction. The motion as made is denied.

█ The defendants contest jurisdiction on the ground that § 36(a) of the Investment Company Act of 1940 does not explicitly authorize a private right of action by a stockholder. In support of their motion, the defendants have not relied on applicable cases involving § 36 of this Act, but rather they emphasize decisions which have denied a right of private action by individual stockholders under other sections of the Federal Securities statutes such as, § 17(a) and 14(e) of the Securities Exchange Act of 1934, the Securities Investor Protection Act of 1970, and § 206 of the Investment Advisers Act of 1940. These sections have no application here. Accordingly, the cases which they cite do not support their contentions under the Investment Company Act of 1940. The court is empowered to act according to § 36 in such a manner as will produce compliance with the statute and correct acts of erroneous and fraudulent practice, or even involving personal misconduct as relates to any registered investment company for which such persons serve or act.[7]

While § 36 upon which the plaintiff relies for a remedy before this court does not specifically contain a reference to a private remedy, the cases have almost unanimously sustained such a right of action. Among these cases are *Brown v. Bullock,* 194 F.Supp. 207, 245 (S.D.N.Y.), aff'd 294 F.2d 415, C.A. 2, 1961, which found that the "clear congressional purpose" of this Act was to protect investors and investment companies by imposing duties on directors and others; *Chabot v. Empire Trust Company,* 301 F.2d 458, C.A. 2, 1962; *Taussig v. Wellington Fund, Inc.,* 187 F.Supp. 179 (D.C.Del.1960), aff'd 313 F.2d 472, C.A. 3, 1963, cert. den. 374 U.S. 806, 83 S.Ct. 1693, 10 L.Ed.2d 1031 (1963); *Esplin v. Hirschi,* 402 F.2d 94, C.A. 10, 1968, cert. den. 394 U.S. 928, 89 S.Ct. 1194, 22 L.Ed.2d 459 (1969); *Herpich v. Wallace,* 430 F.2d 792, C.A. 5, 1970; and *Tanzer v. Huffines,* 314 F.Supp. 189 (D.C.Del.1970).

The defendants, nevertheless, contend that even though these cases would uphold a private right of action, the Investment Company Act of 1970 amended the 1940 statute and in the amendment Congress provided an explicit remedy regarding the payment of management fees (§ 36(b)) without mentioning the substantial body of law which had provided for private remedies for other violations of § 36. They contend that by reason of the fact that Congress failed to include a private right of action in § 36(a), which is applicable in the instant case, that none exists. Again, the defendants are in error.

The recent Supreme Court case of *Merrill Lynch, Pierce, Fenner and Smith, Inc. v. Curran,* —— U.S. ——, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982) outlined the parameters of the inquiry into whether a private right of action is implicit in a federal statutory scheme, after an implied private remedy has already been recognized by the courts prior to the statutory amendment. The question is not whether Congress intended to create a private remedy as a supplement to the express enforcement provisions of the statute, but rather, whether Congress intended to *preserve the pre-existing remedy.* —— U.S. at ——, 102 S.Ct. at 1839, 72 L.Ed.2d at 201.

In the *Merrill Lynch* decision, the Court found it significant that the amendment had left intact the statutory provisions under which federal courts had previously implied a cause of action. In addition, an examination of the legislative history indicated that Congress intended to preserve the existing remedy. The Court stated that "In view of our construction of the intent of the legislature there is no need for us to 'trudge through all four of the factors when the dispositive question of legislative intent

---

7. § 36(a), Investment Company Act of 1940, 15 U.S.C. § 80a–35(a): "If such allegations are established, the court may enjoin such persons from acting in any or all such capacities either permanently or temporarily and award such injunctive or other relief against such person as may be reasonable and appropriate in the circumstances having due regard to the protection of investors and to the effectuation of the policies declared in section 1(b) of this title."

has been resolved.'" —— U.S. at ——, 102 S.Ct. at 1844, 71 L.Ed.2d at 207, quoting *California v. Sierra Club,* 451 U.S. 287 at 302, 101 S.Ct. 1775 at 1783, 68 L.Ed.2d 101 (1980).

After examining the legislative history of the 1970 amendments including the statement in the Senate Report that "... the fact that subsection (b) specifically provides for a private right of action should not be read by implication to affect subsection (a)" [8], I conclude that Congress was aware of the private right of action under § 36, and that the enactment of § 36(a) along with the new provisions of § 36(b) did not attempt to curtail any private remedies under this section, but rather to preserve the pre-existing implied remedies, and further, that it is equally unnecessary to "trudge through" the four factors outlined in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).

### APPOINTMENT OF A RECEIVER

■ The plaintiff by this action seeks the dissolution of the company because of the ulterior motives of the incumbent individuals in charge of the conduct of its business affairs, or the verbal threatening and conduct at Fort Lauderdale of the defendants to metamorphose the corporation to Rockwell's purposes and to the detriment of the preferred stockholders in spite of the defeat of Article 3 and 4 at the election, as these articles sought to do by the stockholders' amendments to the corporate constitution. The plaintiff also charges that needless expenditures of corporate money for the benefit of the defendants (other than the corporation) to Drexel has shown their ulterior motivation; that all this is proof that the preferred stockholders are in imminent danger of loss; and that therefore the corporation should be dissolved.

However, dissolution of a corporation, particularly one issuing 32 million shares of stock and an ongoing solvent corporation which is at present beneficially guided towards the investing preferred stockholders, does not, as of now, seem warranted. Such action by the court would in any event be harsh and as of now precipitous. Accordingly, this court in applying an equitable remedy seeks its guidance from the law as it must apply the facts as it finds them.

■■ The appointment of a receiver or custodian may be appropriate when, as here, a deadlock exists in the corporate action which threatens the legal functioning of the corporation, or danger of loss, justifying the appointment of a receiver with the power to preserve its affairs for the benefit of the stockholders. *Drob v. National Memorial Park, Inc.,* 28 Del.Ch. 254, 41 A.2d 589, 598 (1945). The law of Delaware provides that courts of equity have the inherent right even to wind up the business of a solvent, going corporation and to appoint a receiver for the protection of minority stockholders upon findings of fraud and gross mismanagement by corporate officers, which cannot otherwise be prevented. *Drob, supra,* 41 A.2d at 597; *The Lichens Co. v. Standard Commercial Tobacco Co.,* 28 Del.Ch. 220, 40 A.2d 447; *Thoroughgood v. Georgetown Water Co.,* 9 Del.Ch. 330, 82 A. 689; *Maxwell v. Enterprise Wall Paper Mfg. Co.,* 131 F.2d 400, C.A. 3, 1942.

Delaware law also provides the precedent for the appointment of a temporary receiver or custodian, and yet not wind up the corporate business, but to preserve the corporate assets until the corporation can function properly. In *Drob, supra,* 41 A.2d at 598, the court said:

"But in any event, dissensions resulting in a deadlock among either the directors or between small groups holding equal amounts of stock, making it impossible for the time being to carry on the corporate business to the advantage of the interested parties may justify the appointment of a temporary receiver to pre-

---

**8.** Senate Committee on Banking and Currency, Investment Company Amendment Act of 1969, S. Rep. 184, 91st Cong., 1st Sess. (1969), U.S. Code Cong. & Admin. News 1970, p. 4897. See also: Private Rights of Action Against Mutual Fund Investment Advisers; Amended Section 36 of the 1940 Act, 120 U.Pa.L.Rev. 143, 164 (1971).

serve the corporate assets until it can function properly. 16 Fletch.Encyc. Corps., Per.Ed. 127, 128, 130; *Sternberg v. Wolff,* 56 N.J.Eq. 389, 39 A. 397; *Elevator Supplies Co. v. Wylde,* [106 N.J. Eq. 163], 150 A. 347; *Featherstone v. Cooke,* L.R. 16 Eq. 298; *Trade Auxiliary Co. v. Vickers,* L.R. 16 Eq. 303." [9]

In Pennsylvania, as well as other jurisdictions, the law is similar to that of Delaware. *McDougal v. Huntingdon & Broad Top Mt. R.R. & Co.,* 294 Pa. 108, 143 A. 574, 579. In New Jersey, in cases cited by the Delaware courts, a court of equity in exercise of its general jurisdiction, may appoint a receiver where "there are such dissensions in its governing body as to make it impossible for the corporation to carry on its business with advantage to its stockholders", *Edison v. Edison United Phonograph Co.,* 52 N.J.Eq. 629, 29 A. 195; "by reason of dissensions among the directors of a trading corporation, there is deadlock in the management of its business by them", *Sternberg v. Wolff,* 39 A. 397; or it, the governing body, is "crippled by dissension", *Elevator Supplies Co. v. Wylde,* 106 N.J. Eq. 163, 150 A. 347.

In the federal courts of other districts and circuits, receivers have been appointed for corporations in the exercise of equitable jurisdiction where: "in the board of directors and the administration there was a deep-seated division which could not be healed", D.A. *Tompkins Co. v. Catawba Mills,* C.C.S.C., 82 F. 780; "disagreement of the members of the board of directors of a corporation who are equally divided in number, results in a suspension of the business of the company . . .", *Masters v. Hartmann,* 45 App. D.C. 253, and where "it appears that parties cannot agree upon management of business, and under existing circumstances neither one is authorized to impose its views upon the other . . ." *Saltz v. Saltz Bros.,* 65 App. D.C. 393, 84 F.2d 246, C.A.D.C., 1936.

## NULLIFYING UNAUTHORIZED CORPORATE ACTS

[6] The plaintiff has shown that certain actions taken by the defendants were without proper foundation or authority, such as the resolutions passed by only two of the eight elected directors at the hurriedly called March 19th meeting, and the expenditure of a vast sum of money without Board approval "authorized" by the "Executive Committee" as part of a recapitalization plan aimed at the preferred stockholders.

The plaintiff cites the Delaware case of *Young v. Janas,* 34 Del.Ch. 287, 103 A.2d 299 (1954) for the proposition that an action by an improperly constituted board of directors is void. This opinion by Chancellor Seitz discussed a complex series of election irregularities, and although this situation did not occur in the instant case, the holding that certain actions taken by members of an illegally constituted board of directors were nullities, is pertinent here.

According to Delaware law, public policy demands an undivided loyalty of corporate directors to the corporation. Any breach of a legal or equitable duty to the corporation which has a tendency to deceive others, to violate public or private confidence, or to injury the public interest may be deemed "constructive fraud". *Italo-Petroleum Corporation of America v. Hannigan,* 40 Del. 534, 14 A.2d 401. I find that since the defendants knew that only two of the eight directors present in Fort Lauderdale had been elected, their actions taken to perpetuate their power despite the vote of the stockholders amounted to constructive fraud, and a breach of their fiduciary duty. I find further that the defendants' course of action amounted to an abuse of trust within the meaning of § 36(a) of the Investment Company Act of 1940. *Aldred Inv. Trust v. Securities and Exchange Com'n.,* 151 F.2d 254, C.A. 1, 1946; *Brown v. Bullock, supra.*

## PRELIMINARY RELIEF

The plaintiff has requested the following preliminary relief: (1) an injunction against

---

9. See also: 8 Del. C. § 226(a)(2), which provides for the appointment of a custodian when the corporation is threatened with irreparable injury because of a deadlock between directors.

continuing "breaches of fiduciary on defendants' part"; (2) an injunction against the defendants continuing to act as officers or directors; (3) restitution to the corporation of salaries alleged to have been improperly paid, and the return of money diverted by the defendants to their "personal projects"; and (4) appointment of a custodian or receiver for the corporation.

As a prerequisite to the issuance of a preliminary injunction, the plaintiff has demonstrated a possibility of harm to other interested parties resulting from the grant or denial of preliminary relief, as well as the public interest in general, and this must be taken into account. *Delaware River Port Auth. v. Transamerica Trail Tr., Inc.,* 501 F.2d 917, C.A. 3, 1974; *Commonwealth of Pennsylvania ex rel. Creamer v. U.S. Dept. of Agriculture,* 469 F.2d 1387, C.A. 3, 1972.

I find that the plaintiff has demonstrated a reasonable probability of eventual success on the claims based on § 36(a) of the Investment Company Act of 1940, and the pendant Delaware law claims based on the invalid actions taken by the defendants at the Fort Lauderdale meeting.

I find that the plaintiff and the owners of the preferred stock whom he represents may suffer irreparable harm unless the Executive Committee is enjoined from circumventing the delegated responsibilities of the Board of Directors. In making this determination I have considered the possible harm to not only the preferred stockholders but all of the stockholders, both common and preferred, as well as the interest of the public in general in the regulation of this type of financial organization.

At the conclusion of the hearing, the parties requested a considerable amount of time to summarize the exhibits and submit briefs, findings of fact and conclusions of law, the last of which was submitted by the defendants on September 22, 1982. Additionally, at the conclusion of the hearing and at numerous conferences thereafter, the parties agreed to maintain the status quo pending a final disposition of this matter.

At another conference before me, I sought to have the agreement of all the parties for the retention of a neutral, financial adviser to enable the court to determine, after an examination of the books of the company and its activities, whether the plaintiff's or the defendants' statements and contentions had any basis in fact. I also permitted the parties to send me names of financial advisory experts, or agree to some neutral party without binding the court. The plaintiff at first agreed and afterwards disagreed. The defendants agreed. Under these circumstances, I am now faced with an immovable impasse which must be resolved in order to preserve the rights of the interested owners of approximately 32 million shares of stock.

However, since the parties did not aid the court in furnishing an independent financial adviser to present certain necessary facts which the court must take into consideration, it is incumbent upon me to procure such information in the manner provided by law. Accordingly, I shall assign that function and delegate a United States Magistrate of this court to perform that function. Since I am aware of the fact that the litigants themselves have a personal interest in this litigation, their own interest would seem to come first rather than that of the actual owners of the 32 million shares of stock.

With that amount of evidence before me, completely sufficient to make these findings of fact and conclusions of law, I hold that the meeting at Fort Lauderdale, Florida, being called in the manner in which it was, without notice and purpose of the meeting, was without authority in law and without the internal functioning of the corporation itself; and that any action taken in such a manner was either invalid or *ultra vires* as the case may be and, therefore must be held in abeyance. I find that all persons knew the results of the election on March 16th, when the inspectors of the election made the announcement, and when Attorney Tomlinson Fort, one of the defendant corporate attorneys, stated the results of the election before the instruction

to call the Fort Lauderdale meeting. See Plaintiff's Exhibit 36.

Thus the direction for the call of the Fort Lauderdale meeting by Rockwell was for ulterior motives for the purpose of anticipating any action by the entirely new elected Board when called. The evidence does show that it was anticipated because the 4 new directors against the 4 common stock directors would or might prevent continuance of action in the way Rockwell's controlled officers desired to do. Therefore, the meeting was called to prevent such an occurrence. That the call of this meeting in Fort Lauderdale did not enhance the good feeling which should have existed amongst all directors, is further evidenced by reason of the fact that Rockwell called several Board meetings but at each one did or could not effectuate an orderly, even if without a quorum approval, processing of the meetings.

This antipathy between the parties is reflected by what subsequently occurred in a meeting called on April 5th, when different sets of minutes were reported by each division of the governing family and recorded the occurrences of the meeting as each particular faction saw it. The situation was further aggravated by reason that exclusionary actions were taken against the preferred stockholder directors, when they were denied all non-public information including information relating to the portfolio. It is further indicated that hostility had arisen between the two factions, when the preferred directors moved at a meeting that a verbatim transcript of the meetings should be produced and this was rejected by a 4–4 deadlock. The same result occurred when the preferred group made a motion to hire independent legal counsel. A resolution to set aside all that occurred at the Fort Lauderdale meeting was also prevented by a 4–4 vote. The May and June regular meetings were postponed by the agreement of all the members of the Board. At the next meeting on June 28, disagreement occurred again when the preferred directors proposed to tape-record the entire meeting which was opposed by the Rockwell directors, and the meeting was ad-journed again when no agreement could be reached on this issue.

Thus, the call by Rockwell for the Fort Lauderdale meeting had ulterior motives in anticipating action or failure of action by the entirely new elected Board when called. Also, it was expected that because 4 directors opposing 4 directors would or might prevent action to continue in the way the prior, but continued, officers desired to do, the Fort Lauderdale meeting was called to prevent such an occurrence. That the call of this meeting in Fort Lauderdale did not enhance the good feelings which should have existed amongst all directors, is further evidenced by reason of the fact that Rockwell instructed the calling of the meeting on March 17th, after he knew of the adverse election results.

Since the plaintiff and the defendants are in dispute as to whether or not the status quo of the corporation has been maintained as stipulated, and since it is necessary that I ascertain the actual circumstances as they exist before I can make a final determination, and because it is incumbent upon this court to act as quickly as may be, it is incumbent upon this court to evolve an intermediate process or even a long-term process by which a remedy for the benefit of the equitable owners might result. Since the parties did not agree upon a neutral financial adviser or expert in ascertaining the necessary facts, as I already stated, I find it necessary to delegate that function to procure speedy results, in accordance with law, to the United States Magistrate of this District Court for that purpose. I shall instruct the Magistrate to ascertain whether the status quo is being maintained, as agreed by counsel for the parties, in accordance with that which existed as of July, 1982, and to investigate the financial operation of the company under the present management and to procure, if feasible and possible, expert opinions in regards to any one of the financial operations or projects being conducted by the corporation and its officers.

The Findings of Fact and Conclusions of Law are incorporated in this Opinion pursuant to Federal Rule of Civil Procedure 52.[10]

## ORDER OF COURT

AND NOW, TO-WIT, this 14th day of October 1982, in accordance with the Findings of Fact, Conclusions of Law and authority as set forth in the foregoing Opinion,

IT IS HEREBY ORDERED AND DIRECTED that no legislative action shall be taken by any of the appointed officers of the Cyprus Corporation, defendant, without approval of the full and complete Board of Directors as they were elected on March 12, 1982, or by order of this court and that no change in the status quo, as the same existed as of July, 1982 be initiated or attempted without the full approval of the Board of Directors as they were elected March 12, 1982, or by specific order of this court; that Robert C. Mitchell, the United States Magistrate for the Western District of Pennsylvania, is hereby delegated in accordance with 28 U.S.C. § 636 to aid this court in procuring necessary information, and for that purpose

(1) To examine, as expeditiously as may be possible, the books and records of the corporation and the activities and business contracts of the corporation, its officers and employees as the case may be, where necessary;

(2) To ascertain and report to the court whether the status quo of the corporation has been maintained as it existed as of July, 1982, as agreed to by the defendants;

(3) To ascertain by inquiry and other reasonable time-saving means all the facts and circumstances which will be informative for the court's purposes;

(4) To have such powers as are appropriately and legally within the jurisdiction of the delegative authority by the United States District Court to a United States judicial officer; and

(5) To report periodically, partially, or finally, as may best serve the purposes of this court on such matters as the United States Magistrate deems appropriate concerning this inquiry in accordance with his discretion.

All authority vested in the Magistrate and its performance shall be for the purpose of informing this court on the disputed contentions of the plaintiff as he opposes, contradicts, asserts and denies that the corporation's business activities are in status quo; that no unusual expenditures requiring legislative action of the Board of Directors is being conducted; that no expenditures are being made which should not be made without either the approval of the elected Board of Directors or this court; that no non-basic financial reports or information adversely affecting the credibility or the stability of the corporation be circulated by any of the parties or their representatives; that improper interferences are not introduced into the business or the administration of the corporation by any of the parties or their representatives; and that no function of this corporation be affected and interferred with by any of the parties to this litigation, or their representatives, officers or agents, except by pleadings to this court.

While the Magistrate is performing the specific functions herein delegated for the purposes herein set forth, no payments of any sums of money to Drexel Burnham Lambert, or dealings with the said company shall be made by any of the parties thereto, and any unusual activities not in agreement with the status quo as stipulated by the parties are directed to be held in abeyance until this court, after having received the additional information from the United States Magistrate, has evolved an appropriate remedy for all concerned parties in accordance with law and equity.

---

**10.** Federal Rule of Civil Procedure 52 provides: · "In all actions tried upon the facts without a jury ... the court shall find the facts specially and state separately its conclusions of law thereon, ... If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact and conclusions of law appear therein."