# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| WILLIAM J. BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2021-0595-LWW |
| | ) | |
| MATTERPORT, INC. and | ) | |
| MATTERPORT OPERATING, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORDANDUM OPINION

Date Submitted:  February 22, 2024
Date Decided:  May 28, 2024

Joseph L. Christensen, Meghan M. Dougherty & Michael D. Bell, CHRISTENSEN & DOUGHERTY LLP, Wilmington, Delaware; Edward D. Totino & Benjamin W. Turner, BAKER MCKENZIE LLP, Los Angeles, California; Conal Doyle, DOYLE LAW APC, Beverly Hills, California; *Counsel for Plaintiff William J. Brown*

Robert L. Burns, Kyle H. Lachmund & Nicole M. Henry, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Jennifer Selendy, Joshua S. Margolin & David A. Coon, SELENDY GAY PLLC, New York, New York; *Counsel for Defendants Matterport, Inc. and Matterport Operating, LLC*

**WILL, Vice Chancellor**

Matterport is a technology company that creates 3D digital representations of physical spaces. Its platform has a variety of commercial and consumer uses. The reader may well have encountered Matterport models while exploring real estate, cruise ship cabins, or wedding venues online.

Matterport started out as a venture-backed private company in 2011. In 2013, William Brown became its Chief Executive Officer and led the company through a five-year period of growth. Brown was compensated with stock options and purchased additional shares. After his options were exercised, Brown held almost 1.4 million shares of legacy Matterport stock.

A few years after Brown's departure, Matterport became a public company through a July 2021 de-SPAC transaction. Bylaws adopted in connection with the merger included transfer restrictions thought to apply to all legacy Matterport stockholders. The lockup period was for 180 days post-closing to allow the new security to stabilize. Brown, who had been preparing to sell his position, promptly challenged the lockup in this court as illegal and inequitable.

It was not until November 2021 that Brown opted to submit letters of transmittal and obtained his public Matterport shares in book entry form. When the lawsuit went to an expedited trial the next month, he argued that his shares were excluded from the lockup. He was right. The restriction applied only to public Matterport shares held "immediately following" the close of the de-SPAC. In a

1

January 2022 post-trial opinion, I held that Brown never held lockup shares and was free to trade. He proceeded to sell his block over a multi-day period at roughly $14 per share for total proceeds of approximately $80 million.

Now, Brown is pursuing a recovery of losses caused by his inability to sell sooner. He seeks damages under the highest intermediate price method articulated by the Delaware Supreme Court in *Duncan v. TheraTx*. Brown argues that using this formula, he is entitled to $134 million based on Matterport's all-time high price of $37 per share.

In the post-trial decision that follows, I conclude that Brown is entitled to damages. I decline, however, to award them using highest intermediate price. Unlike in precedent applying *Duncan*, an extensive record provides a responsible basis to estimate when Brown would have traded absent the lockup. There is also no wrongdoer to fairly construe uncertainty against since Matterport's only offense was adopting a bylaw with a loophole. The highest intermediate price framework would unfairly overcompensate Brown and punish Matterport in this unique context.

I measure Brown's damages using the average price of Matterport stock during a reasonable time that Brown would have traded if able. This period begins in November 2021—when Brown requested and received his shares. I go on to analyze the volume of shares he could have traded per day with minimal price impact, the length of a reasonable trading period, and the average price of Matterport

2

stock on the associated trading days. Brown's net damages (after subtracting his prior proceeds) are approximately $79 million.

## I. FACTUAL BACKGROUND

The following facts were found in the January 10, 2022 opinion issued after the phase one trial in this bifurcated action (the "Phase One Opinion"), stipulated to by the parties, or proven by a preponderance of the evidence at the phase two trial.[1] The phase two trial was held over five days during which eleven fact and four expert witnesses testified live.[2] The combined trial record includes 1,459 exhibits and 25 deposition transcripts.[3]

### A. Brown's Legacy Matterport Shares

Defendant Matterport, Inc. is a publicly traded spatial data company that creates 3D technologies for virtual tours of real-world spaces.[4] It was initially a special purpose acquisition company (or SPAC) named Gores Holdings VI, Inc. and

---

[1] Dkt. 122 ("Phase 1 Mem. Op."); Joint Pre-trial Stipulation and Order (Dkt. 303) ("Phase 2 PTO"); *see also* Joint Pre-trial Stipulation and Order (Dkt. 93) ("Phase 1 PTO"); *Brown v. Matterport, Inc.*, 2022 WL 124430 (Del. Ch. Jan. 12, 2022), *aff'd*, 282 A.3d 1053 (Del. 2022). To the extent that conflicting evidence was presented, I have weighed it and made findings of fact accordingly.

[2] Dkts. 308-12. Testimony from the phase two trial is cited as "[Name] Phase 2 Tr." Testimony from the phase one trial is cited as "[Name] Phase 1 Tr."

[3] Facts drawn from exhibits jointly submitted by the parties at trial are referred to according to the numbers provided on the parties' joint exhibit list and cited as "JX__" unless otherwise defined. Deposition transcripts are cited as "[Name] Phase __ Dep."

[4] *See* Matterport, https://go.matterport.com (last visited May 1, 2024).

affiliated with The Gores Group, LLC.[5]  Defendant Matterport Operating, LLC ("Legacy Matterport") is a wholly owned subsidiary of Matterport and was a privately held corporation before a de-SPAC merger with Gores Holdings VI.[6]

Plaintiff William J. Brown was Legacy Matterport's Chief Executive Officer from November 2013 to December 2018.[7]  During his tenure, Brown was awarded Legacy Matterport stock options as part of his compensation and purchased additional shares of Legacy Matterport common stock.[8]  By the time the business combination closed in July 2021, Brown had exercised his options and held 1,387,000 Legacy Matterport shares.[9]  Brown's Legacy Matterport stock was subject to certain transfer restrictions.[10]

---

[5] Phase 2 PTO ¶ 70.

[6] *Id.* ¶¶ 16, 69.  The de-SPAC transaction is referred to as a merger for simplicity, though it is "technically a series of business combinations between SPAC merger subsidiaries and the target that result in the operating company becoming a subsidiary of the SPAC." *In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784, 819 n.4 (Del. Ch. 2022).

[7] Phase 2 PTO ¶ 17; Phase 1 Mem. Op. 2.

[8] Phase 2 PTO ¶ 17; *see also* JX 12; Phase 1 Mem. Op. 2.

[9] Phase 2 PTO ¶ 17.  This total includes shares purchased as part of option grants awarded in 2014 and 2016, as well as restricted shares that Brown purchased in connection with his 2014 bonus.  *Id.* ¶¶ 22, 28, 31.

[10] *Id.* ¶¶ 24-30; *see* JX 10; *see also* JX 8; JX 16; JX 33.

## B.    Early Stock Sale Discussions

In February 2018, Legacy Matterport's Board of Directors told Brown that he would be replaced, citing struggles to raise capital.[11]  This prompted Brown to explore the sale of his Legacy Matterport shares.  Given the size of his position, Brown wanted to diversify to minimize the financial risks of negative stock price movement.[12]  He also recognized that it could take a year for him to establish an alternative market for his shares given the company's recent capital raise.[13]

Brown initially considered selling a portion of his shares over an online trading platform.[14]  He decided that a sale to a secondary purchaser would yield better results.  In February and March 2019, he contacted several potential buyers.[15]

In April 2019, Brown informed Legacy Matterport's new Chief Executive Officer RJ Pittman that he intended to sell most of his stake but wanted to avoid adversely affecting a planned Series E growth funding round.[16]  Pittman expressed concern that the market would look unfavorably upon a former CEO selling his

---

[11] *See* Krikorian Phase 2 Tr. 900; Brown Phase 2 Tr. 152-58; *see also* Brown Phase 1 Tr. 37.

[12] Brown Phase 2 Tr. 22-23, 165.

[13] *Id.* at 23.

[14] In spring 2018, Brown listed 37,000 shares for sale on an online marketplace for $7.08 per share—the preferred share price in the company's most recent funding round. *Id.* at 16-17.  No shares were sold. *Id.* at 17.

[15] Phase 2 PTO ¶ 33; *see* JX 571.

[16] JX 587; *see* JX 580; Brown Phase 2 Tr. 28-30.

shares.[17] He suggested that Brown pause further discussions with secondary buyers and work with Legacy Matterport's Chief Financial Officer on a coordinated sale.[18]

Brown participated in a conference call with Pittman and other Legacy Matterport officers in June.[19] He committed to hold off on further discussions with third party buyers and to explore a secondary sale in conjunction with the Series E round.[20] Pittman and his colleagues went silent.

Over a year later, Pittman suggested that Brown sell his shares to a venture capital firm that Legacy Matterport hoped would become a long-term investor.[21] After initial discussions, an agreement to negotiate terms around a $6.75 share price was reached.[22] Negotiations later collapsed.[23]

## C. The de-SPAC Transaction

By the fall of 2020, Brown suspected that Legacy Matterport was pursuing a business combination with a SPAC.[24] Brown ceased pursuit of a secondary sale and

---

[17] Brown Phase 2 Tr. 28; Pittman Phase 2 Tr. 762-64.

[18] Brown Phase 2 Tr. 30-31; *see also id.* at 35-36.

[19] *Id.* at 32-36.

[20] *Id.* at 36-37.

[21] JX 577 at 2; Brown Phase 2 Tr. 46; Fay Phase 2 Tr. 583; Hébert Phase 2 Tr. 693-96; Pittman Phase 2 Tr. 772-78, 780; *see* JX 644 at 2.

[22] JX 688 at 1.

[23] Brown Phase 2 Tr. 64; JX 704 at 1; *see also* Motschwiller Phase 2 Dep. 80; JX 685.

[24] Brown Phase 2 Tr. 77-82.

turned his focus toward the public market.[25]  On January 18, 2021, Brown told his financial consultant that Legacy Matterport could go public "within 90 day[s] through a SPAC."[26]  Brown said that he "want[ed] to get completely out of [his] position as soon as possible without impacting the market price," with trading to start "as soon as the market open[ed] on day one."[27]

Brown was astute.  Legacy Matterport had been considering potential de-SPAC counterparties for months.[28]  On February 7, 2021, Legacy Matterport's board approved a merger agreement with Gores Holdings VI.[29]  An agreement among Legacy Matterport, Gores Holdings VI, and their merger subsidiaries was executed the same day.[30]

Also on February 7, a majority of Legacy Matterport's stockholders executed written consents approving the merger agreement.[31]  Legacy Matterport stockholders were to receive 4.1193 shares of Matterport Class A common stock per share of

---

[25] *Id.* at 84-92.

[26] JX 854 at 9.

[27] *Id.*

[28] *See* JX 718 at 1.

[29] Phase 2 PTO ¶ 39.

[30] *Id.* ¶ 40; *see* JX 101.

[31] Phase 2 PTO ¶ 41; *see* Pittman Phase 2 Tr. 806; JX 101.

Legacy Matterport stock.[32]  Brown did not (and was not asked to) consent to the approval and adoption of the merger agreement.[33]

### D.    The Lockup

The merger agreement contemplated that the SPAC would adopt Amended and Restated Bylaws (the "A&R Bylaws") to govern Matterport after closing.[34]  The A&R Bylaws were adopted on July 21, 2021.[35]  They became effective on July 22— the day the business combination closed.[36]

The A&R Bylaws imposed a transfer restriction (or lockup) on certain Legacy Matterport stockholders.[37]  Lockups are restrictions on the sale of shares during a set time period.  They are often employed after an initial public offering or de-SPAC to avoid flooding the market and stabilize the price of a new security.[38]  Matterport's transfer restrictions were intended to apply to all shares issued to Legacy Matterport

---

[32] Phase 2 PTO ¶ 73; Phase 1 PTO ¶ 38.

[33] Phase 2 PTO ¶ 41.

[34] *Id.* ¶¶ 52, 54-55.

[35] Phase 2 PTO ¶¶ 64; Phase 1 Mem. Op. 3.

[36] Phase 2 PTO ¶¶ 69-72.

[37] *See* Phase 1 Mem. Op. 3; JX 211(Amended and Restated Bylaws of Matterport, Inc.) ("A&R Bylaws") § 7.10.

[38] *See* JX 282 (Expert Report of Prof. Jay R. Ritter) ("Ritter Report") ¶ 28; JX 1395 (Rebuttal Report of Jesse M. Fried) ("Fried Report") ¶¶ 51-52.

stockholders as merger consideration, including stockholders unaffiliated with Legacy Matterport's directors and officers.[39]

Section 7.10(a) of the A&R Bylaws states that "the holders . . . of shares of Class A common stock . . . may not Transfer any Lockup Shares until the end of the Lockup Period."[40] The "Lockup Period" would end 180 days after the business combination closed.[41] "Lockup Shares" are "the shares of Class A common stock held by the Lockup Holders immediately following the closing of the Business Combination Transaction."[42]

### E.    Brown's Trading Preparations

Shortly after the business combination was announced in February 2021, Brown began analyzing the likely price trajectory of Matterport's stock post-closing.[43] He hypothesized that de-SPAC transactions produced common trading patterns revealing ideal times to trade.[44] To track these patterns, he created a

---

[39] *E.g.*, Fay Phase 2 Dep. 170-74; Pittman Phase 2 Dep. 124; Gustafson Phase 2 Dep. 276-77; Krikorian Phase 2 Dep. 150. Most of Legacy Matterport's stockholders (including Brown) were unaffiliated with its insiders. *See* Fried Report ¶ 57.

[40] Phase 2 PTO ¶ 65; A&R Bylaws § 7.10; Phase 1 Mem. Op. 3 (quoting Section 7.10 of the A&R Bylaws in full). Brown became aware of the lockup in February 2021 "after the deal documents were made public." Brown Phase 2 Tr. 240.

[41] A&R Bylaws § 7.01(d)(i); Phase 2 PTO ¶ 66.

[42] A&R Bylaws § 7.10(d)(ii); Phase 2 PTO ¶ 67.

[43] JX 1071; Brown Phase 2 Tr. 93.

[44] Brown Phase 2 Tr. 94.

spreadsheet model that gathered stock price data from more than 130 SPACs during the 180 days before a de-SPAC closed to 240 days after closing.[45] He further refined the data to focus on transactions involving companies with products and investors similar to Legacy Matterport's or SPACs with sponsors similar to Gores'.[46] His model automatically updated with fresh data and was refined to provide a focused predictive tool for Matterport's stock price.[47] Based on the model, Brown observed that SPACs often experienced a run-up in stock price within the first 160 days post-closing, with prices falling as the lockup expiration approached.[48]

Brown also interviewed financial services firms to sell his Matterport shares and manage his investment portfolio.[49] He retained Rockwood Wealth Management—where his business school roommate worked—as his financial advisor in April 2021.[50] Brown selected Rockwood after reaching an understanding that he could "drive [some] investment decisions" for his portfolio to utilize the many hours Brown had spent studying price trends.[51]

---

[45] JX 1071; *see* Brown Phase 2 Tr. 93-94.

[46] JX 1071; *see* Brown Phase 2 Tr. 97-98.

[47] Brown Phase 2 Tr. 107-08; *see* JX 1071.

[48] Brown Phase 2 Tr. 95.

[49] *Id.* at 109-12.

[50] *Id.* at 113, 119. Brown did not authorize Rockwood to sell his shares until January 2022. *See infra* notes 94-96 and accompanying text.

[51] Brown Phase 2 Tr. 116.

Indeed, Brown's life was consumed by the impending life-changing trade. He moved his family from California to Puerto Rico for tax planning purposes in anticipation.[52] Despite living on borrowed funds, "managing the return [he] was going to get from [his] Matterport position" was his full-time job.[53] He spent "hundreds of hours" on his stock price model.[54]

On July 11, 2021, Brown told Rockwood that it should "still be ready to trade" his shares "starting ~July 23" after the de-SPAC merger closed.[55] The lockup proved to be a problem. On July 13, Brown filed a lawsuit in this court seeking to enjoin the enforcement of the transfer restrictions against him.[56] He claimed that the restrictions in the A&R Bylaws were unenforceable under Delaware law and violated certain preexisting agreements governing his shares.[57] He expressed a desire to "freely transfer his shares upon the close" of the business combination.[58]

---

[52] *Id.* at 59; *see also* JX 710 at 11.

[53] Brown Phase 2 Tr. 99; *see also id.* at 250, 268.

[54] *Id.* at 99.

[55] JX 859 at 34; Brown Phase 2 Tr. 118, 282-83.

[56] *See* Verified Compl. (Dkt. 1); Phase 2 PTO ¶ 2.

[57] Verified Compl. ¶ 23.

[58] *Id.* ¶ 6; *see also id.* ¶¶ 2, 5; JX 245 ¶¶ 86, 95; JX 904 at 14; JX 1700 at 28; JX 915 at 17.

11

## F. Litigation Developments

On July 19, Brown's motion for a temporary restraining order was denied on laches grounds.[59] Legacy Matterport's arguments in connection with the motion alerted Brown to the fact that he retained appraisal rights post-closing.[60] On July 30, Matterport circulated a notice of appraisal to eligible Legacy Matterport stockholders, including Brown.[61] On August 13, Brown demanded appraisal for 1,347,000 of his Legacy Matterport shares.[62] He did not seek appraisal for his remaining 40,000 shares.

Appraisal was not Brown's first choice. He pursued it as a hedging strategy to protect his downside risk while pursuing litigation over whether Matterport could impose unilateral restrictions on his shares.[63] A sale remained the goal. After invoking his appraisal rights, Brown continued to refine his predictive model to

---

[59] Dkts. 26, 29.

[60] Brown Phase 2 Tr. 122; *see* Defs.' Answering Br. in Opp'n to Pl.'s Mot. to Expedite Proceedings and for TRO (Dkt. 18) 6-9, 23.

[61] JX 218; Phase 2 PTO ¶ 76.

[62] JX 223; JX 225.

[63] *See* Brown Phase 1 Dep. 77, 89, 117; Brown Phase 2 Dep. 549-54; Brown Phase 2 Tr. 325-26.

assess Matterport's likely stock price trends.[64] He later declined to file an appraisal petition by the November 19 deadline.[65]

On September 3, 2021, Brown filed an amended complaint advancing three counts. In Count I, Brown sought a declaration that "Section 7.10 of the [A&R Bylaws] [was] unenforceable as to [him]" and that he "may freely transfer shares in Matterport and/or conduct derivative trading involving securities in Matterport, without restrictions."[66] As with his prior complaint, the claim was based on an argument that Delaware law and separate agreements prevented the retroactive imposition of transfer restrictions on Brown's shares.[67] Count II was a claim for declaratory relief regarding the equitable validity of the transfer restrictions and Count III was a claim for breach of fiduciary duty against Legacy Matterport's directors.[68]

Because expedited adjudication was unwarranted for Counts II and III, I bifurcated the proceeding. A trial on Count I was set for December 2021.[69] My

---

[64] Brown Phase 2 Tr. 132-33.

[65] Phase 2 PTO ¶ 80; *see* Brown Phase 1 Tr. 30.

[66] Verified Am. Compl. (Dkt. 38) ¶ 88.

[67] *E.g.*, *id.* ¶ 7.

[68] *Id.* ¶¶ 94, 105-06.

[69] *Id.* ¶¶ 93-106. Brown filed a Verified Second Amended Complaint on November 17, 2021 that left Count I unchanged. Dkt. 81.

intention was to issue a decision on Count I before January 19, 2022, when the expiration of the lockup might cause Matterport's stock price to fall.

### G.    The Letters of Transmittal

Legacy Matterport stockholders could obtain their Matterport shares by submitting letters of transmittal to Matterport's transfer agent American Stock Transfer & Trust Company ("AST").[70]  AST mailed Legacy Matterport stockholders blank letters of transmittal shortly before the de-SPAC closed.[71]   Some Legacy Matterport stockholders returned their letters soon after receipt.   On August 13, 2021, AST first issued shares to stockholders who had done.[72]

It was not until November 2021 that Brown sent a letter of transmittal to AST. On November 9, he submitted a letter of transmittal for 37,000 Legacy Matterport shares that were excluded from his appraisal demand.[73]  When the deadline to file an appraisal petition lapsed on November 19, he submitted a second letter of transmittal for 1,350,000 Legacy Matterport shares.[74]   In the interim, 5,713,441

---

[70] Phase 2 PTO ¶ 74.

[71] JX 916; *see* JX 919.

[72] JX 1133; JX 1162.

[73] JX 276.

[74] JX 400.

14

Matterport shares were credited to Brown's AST account on November 18.[75] Matterport stock closed at $27.40 per share as of that date.[76]

On November 22, AST mailed Brown a direct registration book entry advice (dated November 18) for his 5,713,441 Matterport shares.[77] The document stated that Brown's shares were subject to the transfer restrictions in the A&R Bylaws. Brown testified that he received the notice from AST on November 27.[78]

Meanwhile, on November 24, Brown's counsel sent a letter to Matterport's counsel demanding that the transfer restrictions be removed from Brown's shares.[79] A similar letter was sent to AST's counsel on November 30.[80] Both letters asserted that Brown's shares were not Lockup Shares under Section 7.10 of the A&R Bylaws because they were not held "immediately following the closing of the Business Combination [on July 22]."[81]

---

[75] *See* JX 402. I cannot discern why AST credited all of Brown's Matterport shares to his account on November 18. Perhaps AST read Brown's November 9 letter of transmittal to include his full stake. In any event, Brown submitted his first letter of transmittal on November 9 and received his public Matterport shares nine days later.

[76] JX 1519 at 3.

[77] JX 402; JX 1104.

[78] Brown Phase 1 Tr. 32.

[79] JX 526.

[80] JX 527; *see* JX 405.

[81] JX 527 at 2 (citation omitted); *see* JX 526 at 1.

15

At the time of the November 30 demand letter, Brown's shares were worth over $170 million.[82]  Matterport's share price reached a high of $37.60 on December 1.[83]

## H.    The Phase One Trial

A trial to resolve Count I of Brown's complaint was held on December 1 and 2, 2021.  At post-trial argument on December 21, Brown's lead argument was that his shares were not covered by the plain terms of the transfer restriction.[84]  The post-trial Phase One Opinion was issued on January 10, 2022.

In the Phase One Opinion, I held that Brown's shares were not Lockup Shares as defined in Section 7.10(d)(ii) of the A&R Bylaws.  He did not hold Matterport shares "immediately following" the closing of the merger.[85]  When the de-SPAC transaction closed, "Brown held only the right to receive Matterport Class A common shares."[86]  He was first issued Matterport shares in November 2021, after sending letters of transmittal to AST.[87]  Because "[o]btaining shares over 100 days

---

[82] JX 1519 at 3.

[83] *Id.*

[84] *See* Dkt. 121.

[85] Phase 1 Mem. Op. 10.  The Phase One Opinion was affirmed on July 27, 2022 after an expedited appeal.  *Matterport, Inc. v. Brown*, 282 A.3d 1053 (Del. 2022).

[86] Phase 1 Mem. Op. 9.

[87] *Id.* at 10; *see also* JX 276; JX 311.

after closing is not 'immediately,'" Brown was free to trade.[88] "All other relevant issues remain[ed] for the second phase of this litigation."[89]

## I.    The Trade

On January 11, 2022—the day after the Phase One Opinion was issued—AST delivered 5,713,441 unrestricted Matterport Class A common shares to Brown's brokerage account.[90] Matterport stock opened at $16.21 that morning.[91]

The lockup's January 18 expiration loomed.[92] Although Brown wanted to exit his position quickly, he was mindful that doing so could depress Matterport's stock price.[93] He instructed Rockwood to sell his shares before the lockup expired while minimizing the price impact.[94] Rockwood opted for a trading strategy focused on the volume weighted average price of Matterport's stock. Its objective was to complete the sales over a compressed multi-day window with no residual shares after the lockup expired.[95]

---

[88] Phase 1 Mem. Op. 10.

[89] *Id.* at 12.

[90] Phase 2 PTO ¶ 86.

[91] JX 1519 at 3.

[92] Phase 2 PTO ¶ 88.

[93] Brown Phase 2 Tr. 146.

[94] *Id.*; Augenblick Phase 2 Tr. 363.

[95] Augenblick Phase 2 Tr. 364-65.

Through Rockwood, Brown sold his entire Matterport stake between January 11 and January 18 at a weighted average price of $14.09 per share. This resulted in net sales proceeds of approximately $80,427,139.60.[96]

## J. The Phase Two Trial

On September 19, 2022, Brown filed a Verified Third Amended Complaint advancing four claims.[97] Count I is the same declaratory judgment claim on which Brown prevailed at the phase one trial.[98] Count II is a claim for violation of 8 *Del. C.* § 202 against Matterport and its directors.[99] Count III is a claim for breach of fiduciary duty against the director defendants.[100] And Count IV is a claim for breach of 6 *Del. C.* § 8-401.[101] Brown seeks damages of $141,293,395.93.[102]

On November 9, 2023, Brown voluntarily dismissed the director defendants from the action.[103] He also voluntarily dismissed Count III.[104]

---

[96] Phase 2 PTO ¶ 87. Brown received an additional $5,082,088.27 when he sold vested earn-out shares on February 11, 2022. *Id.* ¶ 95. This sale has no effect on Brown's damages.

[97] Verified Third Am. Compl. (Dkt. 140).

[98] *Id.* ¶¶ 58-66.

[99] *Id.* ¶¶ 67-73.

[100] *Id.* ¶¶ 74-92.

[101] *Id.* ¶¶ 93-103.

[102] *Id.* at 40.

[103] Dkt. 295.

[104] Phase 2 PTO ¶ 12.

A five-day trial on Counts II and IV, and the remedy for Count I, began on November 13, 2023.[105] After post-trial briefing and argument, the matter was submitted for decision on February 22, 2024.[106]

## II. LEGAL ANALYSIS

Brown has the burden of proving the elements of his claims by a preponderance of the evidence.[107] Proof by a preponderance of the evidence means that something is more likely than not.[108] In phase one of this case, he prevailed in showing that his shares were not Lockup Shares as defined in the A&R Bylaws. Now, he seeks to prove that Matterport violated Section 202 of the Delaware General Corporation Law and Section 8-401 of the Delaware Uniform Commercial Code. He also seeks monetary damages.

My analysis proceeds in a crescendo of complexity. First, I hold that Brown lacks standing to press a claim under Section 202. Next, I conclude that Matterport's initial failure to transfer Brown's shares was not unreasonable under Section 8-401. Finally, I conclude that Brown is entitled to damages for losses incurred after he

---

[105] Dkts. 308-12.

[106] *See* Dkts. 325-26.

[107] *See Dieckman v. Regency GP LP*, 2021 WL 537325, at *18 (Del. Ch. Feb. 15, 2021), *aff'd*, 264 A.3d 641 (Del. 2021) (TABLE).

[108] *Physiotherapy Corp. v. Moncure,* 2018 WL 1256492, at *3 (Del. Ch. Mar. 12, 2018).

19

received Matterport shares but was prevented from trading due to the lockup's erroneous application.

## A.    The Section 202 Claim

Section 202(b) of the Delaware General Corporation Law permits transfer restrictions to be enacted by the "certificate of incorporation or by the bylaws or by an agreement."[109]  The statute provides that: "No restrictions so imposed shall be binding with respect to securities issued prior to the adoption of the restriction unless the holders of the securities are parties to an agreement or voted in favor of the restriction."[110]

Brown claims that the transfer restrictions in the A&R Bylaws contravened this sequencing requirement because they were not made effective before Class A shares were issued but "upon the consummation" of the business combination.[111]  He also insists that Section 202(b) would bar the imposition of unilateral restrictions on Legacy Matterport shares, which were issued before the restrictions were adopted

---

[109] 8 *Del. C.* § 202(b).

[110] *Id.*

[111] JX 136 at 255.

and reflect a continuing interest as Matterport Class A shares.[112] He did not consent to the transfer restrictions.[113]

Brown lacks standing to press this claim. The transfer restrictions in the A&R Bylaws did not apply to Brown because he never held Lockup Shares.[114] As a result, he cannot raise a statutory claim premised on the form or manner of Matterport's adoption of the transfer restrictions. He also could not have suffered an "injury in fact" causally connected to a purported Section 202 violation.[115]

Brown's damages result from Matterport's refusal to transfer unrestricted shares based on a misreading of the A&R Bylaws—not from the legality of the

---

[112] These arguments were largely made in Brown's phase one briefing. *See* William J. Brown's [Phase 1] Pre-trial Br. (Dkt 88) 27-42; William J. Brown's [Phase 1] Post-trial Opening Br. (Dkt. 103) 31-40; *see also* Pl. William J. Brown's Phase 2 Post-trial Br. (Dkt. 315) ("Pl.'s Post-trial Opening Br.") 28-29; Pl. William J. Brown's Reply Phase 2 Post-trial Br. (Dkt. 322) ("Pl.'s Post-trial Reply Br.") 11.

[113] Phase 1 Mem. Op. 1.

[114] *Id.* at 9-10. Put differently, even if the transfer restrictions violated Section 202, Brown never held shares to which those restrictions applied.

[115] *See Soc'y Hill Towers Owners' Ass'n v. Rendell*, 210 F.3rd 168, 175-76 (3d Cir. 2000) (listing the elements for standing (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992))); *see also Thornton v. Bernard Techs., Inc.*, 2009 WL 426179, at *5 (Del. Ch. Feb. 20, 2009) (holding that a plaintiff lacked standing because the damages sought did not arise logically and directly from the unlawful conduct).

21

lockup as adopted. A ruling on whether transfer restrictions inapplicable to Brown's shares complied with Delaware law would amount to an advisory opinion.[116]

## B. The Section 8-401 Claim

Section 8-401 of the Delaware Uniform Commercial Code concerns the duty of an issuer to register a requested transfer of securities, including the issuance of freely transferable shares.[117] The statute provides that:

> If a certificated security in registered form is presented to an issuer with a request to register transfer or an instruction is presented to an issuer with a request to register transfer of an uncertificated security, the issuer shall register the transfer as requested if [among other preconditions]. . . the transfer is in fact rightful or is to a protected purchaser.[118]

If the conditions of the provision are met, an issuer with "a duty to register a transfer of a security" is liable to the person making the transfer request "for loss resulting

---

[116] *See In re Aristotle Corp.*, 2012 WL 70654, at *3 (Del. Ch. Jan. 10, 2012) (noting that the "[Delaware] Supreme Court has warned trial courts against the dangers of making advisory decisions" where "there is no legitimate need . . . to determine" the issue).

[117] 6 *Del. C.* § 8-401; *see Bender v. Memory Metals, Inc.*, 514 A.2d 1109, 1115 (Del. Ch. 1986) (extending Section 8-401 to a stockholder's request for the reissuance of stock certificates without restrictive legends, which was an "integral step" in the transfer process).

[118] 6 *Del. C.* § 8-401(a).

from unreasonable delay in registration or failure or refusal to register the transfer."[119]

Brown argues that Matterport violated Section 8-401 when it refused his November 2021 demands to remove restrictions from his shares and deliver them to his brokerage account.[120] In his view, Matterport's rejection of the demands subjects it to strict liability without regard to the reasonableness of its actions. He reads the word "unreasonable" in the statute to modify the phrase "delay in registration" but not "failure or refusal to register the transfer."[121]

It is well settled, however, that an issuer can inquire into the rightfulness of a transfer request.[122] An issuer's liability for a "loss occasioned by a refusal to transfer" arises when it refuses to transfer securities "for a wrongful reason."[123] A refusal to register a transfer of stock may not be wrongful if the issuer has

---

[119] *Id.* § 8-401(b).

[120] *See* Pl.'s Post-trial Opening Br. 24-28.

[121] 6 *Del. C.* § 8-401(b); *see* Pl.'s Post-trial Opening Br. 26.

[122] 6 *Del. C.* § 8-401(a)(7) (imposing a duty to register a requested transfer only where doing so would be "rightful"); *see also Bender*, 514 A.2d at 1116; 12 William Meade Fletcher, Fletcher Cyc. Corp. § 5527, Westlaw (database updated Sept. 2023) (listing various circumstances under which the company may be "justified in refusing to transfer the stock of one of its shareholders").

[123] *Loretto Literary & Benevolent Inst. v. Blue Diamond Coal Co.*, 444 A.2d 256, 259 (Del. Ch. Mar. 12, 1982).

23

"reasonable grounds" to do so.[124]  It "must act in good faith and present some adequate reason for its refusal, and support such refusal by evidence."[125]

The Court of Chancery's decision in *Loretto Literary & Benevolent Institution v. Blue Diamond Coal Co.* is instructive.[126]  There, the court considered stockholders' challenge to a company's refusal to record transfers of shares to the stockholders' individual members.[127]  After the stockholders' request for injunctive relief was mooted by a recordation of the shares, the stockholders sued for money

---

[124] *Dewitt v. Am. Stock Transfer Co.*, 433 F. Supp. 994, 1000 (S.D.N.Y. 1977) ("The refusal [to transfer shares] is not wrongful . . . if the issuer and transfer agent can point to reasonable grounds for their failure to act." (citation omitted)); *Kanton v. U.S. Plastics, Inc.*, 248 F. Supp. 353, 363 (D. N.J. 1965) ("The general rule is that a corporation may refuse to register a transfer of stock when it has reasonable grounds for doing so . . . .").

Brown relies on a case from the United States District Court for the Eastern District of Pennsylvania to argue that there is no reasonableness review for a refusal to transfer. Pl.'s Post-trial Opening Br. 26.  There, the court considered whether the inclusion of the word "unreasonable" in Section 8-401 of the UCC meant that it sounded in tort for purposes of assessing the proper statute of limitations. *Jodek Charitable Tr., R.A. v. Vertical Net Inc.*, 412 F. Supp. 2d 469, 482 (E.D. Pa. 2006).  The court's discussion of whether Section 8-401 invites a "reasonableness" inquiry assessed whether a negligence standard applied. *Id.*  It did not address whether an issuer can avoid liability for a refusal to transfer when acting reasonably.

[125] *Kanton*, 248 F. Supp. at 362; *see also* 12 Fletcher Cyc. Corp. § 5527 ("A corporation may always refuse to make a transfer when it has reasonable ground for so doing, but it must act in good faith and present some adequate reason for its refusal and support it by some evidence.").  Brown critiques the applicability of *Kanton* since the case applied the law of a state that had not adopted the UCC. Pl.'s Post-trial Reply Br. 9-10.  But the parties in *Kanton* assumed that the UCC applied and the court analyzed the relevant UCC provision.  248 F. Supp. at 363.

[126] 444 A.2d 256 (Del. Ch. 1982).

[127] *Id.* at 257.

24

damages and costs.[128]  The court rejected the request for what amounted to punitive damages but awarded attorneys' fees because the company had not shown "any reasonable justification to refuse to transfer the shares."[129]  In doing so, the court explained that "a refusal to register a transfer must be based on a legitimate ground supported by some credible evidence."[130]

The record demonstrates that Matterport had a reasonable basis to deny Brown's November 2021 demands for unrestricted Matterport shares.  Matterport's principals held a good faith—albeit mistaken—belief that the restrictions in Section 7.10 of the A&R Bylaws applied to all shares received by Legacy Matterport stockholders (including Brown).[131]  This view was supported by the advice of

---

[128] *Id.* at 257-58.  At the time, the relevant provision of the Delaware UCC stated: "Where an issuer is under a duty to register a transfer of a security the issuer is also liable to the person presenting it for registration or his principal for loss resulting from any unreasonable delay in registration or from failure or refusal to register the transfer."  *Id.* at 258 (quoting 6 *Del. C.* § 8-401(2)).

[129] *Id.* at 261.  The court did not limit the application of a reasonableness review to the attorneys' fee context.  It relied on precedent recognizing the "general rule" that an issuer may refuse to transfer stock when it has reasonable grounds to do so.  *Id.* (citing *Kanton*, 248 F. Supp. 353, and 12 Fletcher Cyc. Corp. § 5527 (perm. ed.)).

[130] *Id.*; *see also Loretto Literary & Benevolent Inst. v. Blue Diamond Coal Co.*, 1980 WL 268060, at *2 (Del. Ch. Oct. 24, 1980) ("A refusal is not wrongful . . . if the issuer can point to a reasonable ground[ ] for his refusal to transfer." (citing *Travis Inv. Co. v. Harwyn Publ'g Corp.*, 288 F. Supp. 519 (S.D.N.Y. 1968))).

[131] *E.g.*, Fay Phase 2 Tr. 655; Pittman Phase 2 Tr. 815; JX 1105 at 3; JX 890; *see also* 12 Fletcher Cyc. Corp. § 5527 (describing situations in which a corporation may reasonably refuse to register a transfer as including "the holder of the certificate [not] comply[ing] with the provisions of the corporate bylaws governing transfer").

counsel.[132]  Matterport maintained this position through months of litigation until the Phase One Opinion was issued, when it promptly transferred unrestricted shares to Brown.[133]  Accordingly, Matterport is not liable to Brown under Section 8-401.

## C.    The Declaratory Judgment Claim

Brown previously prevailed on the merits of his declaratory judgment claim in Count I.  The Phase One Opinion held that Brown's shares were not Lockup Shares under Section 7.10 of the A&R Bylaws.[134]  Left for resolution is Brown's entitlement to damages for any losses caused by Matterport's initial refusal to issue freely transferable shares.

This court has "broad discretion to form an appropriate remedy for a particular wrong."[135]    The Declaratory Judgment Act permits the court to provide supplementary relief "whenever necessary or proper" in resolving a claim.[136]  An

---

[132] *See* Pittman Phase 2 Tr. 815; *see also Bender*, 514 A.2d at 1119 n.12 ("[T]he issuer's reliance upon an opinion of counsel is normally regarded as reasonable." (citing *Kenler v. Canal Nat'l Bank*, 489 F.2d 482, 487 (1st Cir. 1973))).

[133] *See supra* note 90 and accompanying text.

[134] Phase 1 Mem. Op. 9-10.

[135] *Whittington v. Dragon Gp. LLC*, 2011 WL 1457455, at *15 (Del. Ch. Apr. 15, 2011); *see also Lichens Co. v. Standard Com. Tobacco Co.*, 40 A.2d 447, 452 (Del. Ch. 1944).

[136] 10 *Del. C.* § 6508.

appropriate remedy in a declaratory judgment proceeding "clearly includes an award of damages."[137]

Brown seeks damages using the "highest intermediate price" formula recognized in *Duncan v. TheraTx*.[138]  He calculates his losses as the difference between (1) the highest intermediate price of Matterport stock during a reasonable time in which he could have sold his shares but for the lockup and (2) his January 2022 sale proceeds of $80,427,139.60.[139]  Brown relies on law and economics theory in support of this method.  Matterport opposes its application.

The highest intermediate price framework is ill-suited for this case.  The policies animating *Duncan* are absent.  There is neither significant factual uncertainty nor a wrongdoer to construe uncertainty against.  Instead, the dispute is over the meaning of a bylaw and there is sufficient evidence to make a responsible assessment of when Brown would have traded.  Awarding damages based on the highest intermediate price would require me to disregard this factual record.  Brown's damages are more appropriately measured by the average price over a

---

[137] *Sullivan v. Local Union 1726 of AFSCME, AFL-CIO*, 464 A.2d 899, 903 (Del. 1983) (citing 10 *Del. C.* § 6508).

[138] 775 A.2d 1019, 1020 (Del. 2001).

[139] Pl.'s Post-trial Opening Br. 36-38.  Although Brown acknowledges that the second time period in a *Duncan* analysis would typically consider the average market price of a stock during a reasonable period after a restriction was lifted, he contends this hypothetical calculation is unnecessary since sold his shares before the Lockup Period expired.  *Id.* at 37-38.

reasonable time period that he would have traded had the transfer restrictions been removed.

### 1. The *Duncan* Methodology

In *Duncan*, the Delaware Supreme Court considered the "the appropriate default measure of damages under Delaware law for an issuer's breach of a merger agreement that results in a temporary restriction on certain stockholders' ability to sell their shares."[140] The defendant corporation breached the merger agreement by suspending the shelf registration for its shares, which temporarily restricted certain stockholders from selling.[141] After the shelf registration was reinstated and the restrictions lifted, the plaintiff stockholders "sold their shares at various times, and thus at various prices."[142] Calculating damages was a theoretical exercise due to numerous unknowns surrounding when the plaintiffs would each have sold "but-for" the restrictions.[143] Thus, the court looked to the "highest intermediate price" in "a reasonable period after the restriction was imposed during which the stockholders could have sold the[ir] shares" as an appropriate "rough approximation of what the

---

[140] 775 A.2d at 1021.

[141] *Id.*

[142] *Id.* at 1021 n.2.

[143] *Id.* at 1022-23 (citing *Am. Gen. Corp. v. Cont'l Airlines Corp.*, 622 A.2d 1, 10 (Del. Ch. 1992)); *see also Cont'l Airlines*, 622 A.2d 1 (applying a modified form of the highest intermediate price approach).

stockholders would have received absent the restrictions."[144] Damages were

calculated as:

> the difference between (1) the highest intermediate price of the shares during a reasonable time at the beginning of the restricted period, which functions as an estimate of the price that the stockholders would have received if they had been able to sell their shares, and (2) the average market price of the shares during a reasonable period after the restrictions were lifted.[145]

The highest intermediate price rule has primarily been applied to breach of

contract or conversion cases concerning property with dynamic value.[146] In *Duncan*

and its progeny, damages awards were designed to compensate stockholders for their

lost expectation interests caused by breaching parties.[147] The "intuition" for the

approach is that the defendant bears the "risk of uncertainty in the share price" since

its wrongful act prevents the court from calculating damages "with any degree of

---

[144] *Duncan*, 775 A.2d at 1023; *id.* at 1023 n.9 (discussing that the approach was "adapted from the rule used to determine damages in conversion cases because, by preventing the stockholders from trading their shares, the issuer's breach at least in some sense is a temporary 'conversion' of the shares" (citing *Madison Fund, Inc. v. Charter Co.*, 427 F. Supp. 597, 609-10 (S.D.N.Y. 1977))); *see also Cont'l Airlines*, 622 A.2d at 10 (explaining that the highest intermediate price is an appropriate damages measure where a breach causes the "deprivation of [the stockholder's] range of elective action" and "prevent[s] a court from determining with any degree of certainty what the plaintiff would have done with his securities had they been freely alienable").

[145] *Duncan*, 775 A.2d at 1020.

[146] *See, e.g.*, *id.* at 1022-23; *Cont'l Airlines*, 622 A.2d at 8-9; *BioLife Sols., Inc. v. Endocare, Inc.*, 838 A.2d 268, 283-84 (Del. Ch. 2003); *Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1, 18-20 (Del. Ch. 2003); *Haft v. Dart Gp. Corp.*, 877 F. Supp. 896, 901-02 (D. Del. 1995); *Wyndham, Inc. v. Wilm. Tr. Co.*, 59 A.2d 456, 459-60 (Del. Super. 1948); *Galigher v. Jones*, 129 U.S. 193, 200 (1889).

[147] *Duncan*, 775 A.2d at 1022.

certainty."[148]  This rationale has also been extended to cases involving breaches of fiduciary duty where uncertainty is held against the fiduciary defendants.[149]

A common thread through the cases is considerable uncertainty—fairly borne by a wrongdoer—around when a sale would have occurred but for the defendant's actions.[150]  In *BioLife Solutions, Inc. v. Endocare, Inc.*, for example, the defendant failed to perform its contractual obligation to file a registration statement in connection with its purchase of assets in exchange for shares.[151]  The court followed *Duncan* because the defendant's breach left "no way of knowing precisely when a registration statement would have become effective or when . . . the 'restricted period' began."[152]  And in *Comrie v. Enterasys Networks, Inc.*, eleven plaintiffs sued after the defendant breached an obligation to the sellers of a business by issuing

---

[148] *Id.* at 1023 (quoting *Cont'l Airlines*, 622 A.2d at 10); *cf. Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1132 (Del. 2015) (discussing that certain uncertainties in a damages calculus should be attributed to the breaching party).

[149] *See Paradee v. Paradee*, 2010 WL 3959604, at *13 (Del. Ch. Oct. 5, 2010) (applying the highest intermediate price method where a trustee failed to notify the plaintiff of the trust and right to become trustee, depriving the plaintiff of the ability to sell the trust's shares at a value in excess of their current price); *Schultz v. Commodity Futures Trading Comm'n*, 716 F.2d 136, 141 (2d Cir. 1983) (calculating damages using the highest intermediate value where a broker liquidated his client's account without authorization); *cf. Steinhardt v. Howard-Anderson*, 2012 WL 29340, at *13-14 (Del. Ch. Jan. 6, 2012) (resolving uncertainty in calculating the amount of a disgorgement remedy against a party who breached his fiduciary duties by trading on confidential information).

[150] *See Duncan*, 775 A.2d at 1022-23.

[151] 838 A.2d at 270.

[152] *Id.* at 283-84.

replacement options with a negative "in the money" value.[153] The court applied *Duncan* given ambiguity over when the various option holders would have exercised vested options and sold the underlying shares.[154]

The circumstances prompting courts to award damages using the highest intermediate price are missing here. Matterport was not found to have breached a contract, committed a tort, or violated positive law.[155] When the A&R Bylaws were adopted (and for months post-closing), the parties believed that the lockup as written extended to all Legacy Matterport stockholders.[156] Brown apparently shared this view until November 2021 when he tendered letters of transmittal.[157]

The Phase One Opinion recognized that the transfer restriction in the A&R Bylaws was drafted so that a stockholder could (and Brown did) circumvent its

---

[153] 837 A.2d at 5 n.7, 12.

[154] *Id.* at 20. The damages calculation encountered further uncertainties as the stock options were subject to "two significant contingencies": a four-year vesting period and limitations on the number of vested options (and the exercise of these options) if a member of the plaintiff stockholder group were terminated. *Id.* at 19.

[155] *See supra* notes 131-33 and accompanying text. At trial, Brown sought to present evidence that Legacy Matterport and members of its board ignored his information requests and pursued a secondary offering designed to benefit insiders. *See* JX 618; JX 999; JX 1001. Yet he voluntarily dismissed his breach of fiduciary duty claim. Dkt. 295. Even if Legacy Matterport insiders were aware of the possibility of a future secondary offering when they were negotiating the business combination, there is no evidence that they connected the lockup to a potential secondary offering.

[156] *See infra* note 162.

[157] *See supra* notes 57, 67, 81, 84 and accompanying text.

terms.  The lockup provision was ineffective.  It was not invalid or unlawful as to Brown.

The lockup was also not a product of conflicts or used to benefit insiders at the expense of non-insiders (like Brown).  As with traditional IPOs where lockups are ubiquitous, lockups in the de-SPAC context create a valuable limit on selling pressure after a stock begins to trade publicly.[158]  Supporting the issuer's price after a de-SPAC is crucial since the post-closing shares are an economically different security than the SPAC's shares and the stock price is no longer supported from below by redemption rights.[159]  Selling pressure by legacy stockholders can have a substantial negative effect on the issuer's stock price.[160]  Lockups reaching both insiders and non-insiders can reduce this price pressure on the stock for the period of the lockup.[161]  Gores Holdings VI and Legacy Matterport understood this rationale for Section 7.10 of the A&R Bylaws in connection with the business combination.[162]

Even if one could view Matterport as a wrongdoer, there is an extensive record from which to reasonably approximate when Brown would have sold his shares.

---

[158] *See* Ritter Report ¶¶ 38, 39, 42; Fried Report ¶ 49 n.76 (discussing the common use of lockups reaching both insiders and some or all non-insiders in the IPO context).

[159] *See* Ritter Report ¶ 42.

[160] *See id.* ¶¶ 39, 42; Fried Report ¶¶ 52, 55, 56.

[161] *See* Fried Report ¶¶ 51, 52, 53, 55, 56.

[162] *E.g.*, Stone Phase 2 Dep. 52; Pittman Phase 2 Dep. 46; Krikorian Phase 2 Dep. 51-52; Gustafson Phase 2 Dep. 60-61; Pittman Phase 2 Tr. 799.

There is no need to risk the manipulation inherent in the highest intermediate price framework.[163] Unlike in *Duncan* where there was no reliable evidence of when the plaintiffs would have sold, this court has hundreds of exhibits and hours of testimony on the subject. Applying the highest intermediate price rule would nullify this evidence and limit the court's discretion to craft an appropriate remedy.

That does not mean Brown lacks recourse against Matterport. Brown's right to freely trade was impaired by Matterport's misreading of the bylaw and Matterport is responsible for fairly compensating him. It seems unbalanced, though, to cause Matterport to pay Brown damages exceeding the cost of his harms.[164] If there were a breach of contract (as in *Duncan*) and uncertainty around when the non-breaching party would have sold, the highest intermediate value approach might be justified. But there is neither.

---

[163] *See infra* Section II.3.a.

[164] *See Duncan*, 775 A.2d at 1023 n.8 (noting that the hypothetical determinations in calculating the highest intermediate price are "difficult because, once litigation begins, the parties will be likely to 'cherry-pick' the most advantageous date for their position"); *Tamari v. Bache & Co. (Lebanon) S.A.L.*, 838 F.2d 904, 907 (7th Cir. 1988) (the highest intermediate price "is a generous—maybe too generous—measure of damages; it assumes that the customer would have had the clairvoyance to sell when the stock hit its peak during the relevant period").

### 2. Law and Economics Justifications

Brown offered the expert testimony of Professor Guhan Subramanian to support the application of the highest intermediate price formula.[165]  Subramanian opined that the principle of "highest intermediate value" is consistent with two strands of law and economics: optimal deterrence theory and efficient contracting theory.[166]  Neither theory supports Brown's preferred approach to damages, as Matterport's expert Professor Jesse Fried reasoned in rebutting Subramanian's analysis.[167]

Under optimal deterrence theory, remedies should deter a party from infringing on others' rights unless doing so is socially optimal.[168]  In the context of contract law, an optimal remedy will lead a party to breach an agreement and pay damages only if the overall benefit outweighs the costs (i.e., an efficient breach).[169]

---

[165] JX 1382 (Second Expert Report of Prof. Guhan Subramanian) ("Subramanian Report").

[166] *Id.* ¶ 16.

[167] *See generally* Fried Report.

[168] *See* Fried Report ¶ 91; *see also* Subramanian Report ¶ 35; Fried Phase 2 Tr. 1009; Subramanian Phase 2 Tr. 949.

[169] *See* Subramanian Report ¶ 35.

Optimal deterrence theory can also apply in contexts other than contract law, such as to deter criminal or unlawful conduct.[170]

The optimal deterrence paradigm is unfit for the present matter. The logic behind the theory is that one will be deterred from infringing on another's rights unless doing so increases economic value to society. The dispute here concerns the meaning of a bylaw provision—not a culpable act. And even if optimal deterrence theory arguably applies to the infringement on a stockholder's rights, damages should equal the cost imposed on the counterparty. The highest intermediate price approach would exact damages greater than Brown's costs, outside of the improbable scenario where he would have sold at that price.[171]

Efficient contracting theory fills gaps in contracts and supplies default remedies based on what parties would have agreed to had they contemplated an issue.[172] It assumes that the parties would seek a value-maximizing term relative to suboptimal terms because all would benefit from the former.[173] Put differently, the

---

[170] *See* Fried Report ¶ 90.

[171] *See id.* ¶¶ 92-94; Fried Phase 2 Tr. 1014.

[172] *See* Subramanian Report ¶ 43; Subramanian Phase 2 Tr. 954-55.

[173] *See* Subramanian Report ¶ 43.

theory gap-fills imperfectly drafted contracts *ex post* with an optimal term that the parties would have bargained for *ex ante*.[174]

This theory is also inapt. There is no negotiated bilateral contract with a gap.[175] The A&R Bylaws were purportedly imposed on all Legacy Matterport stockholders—including Brown (who did not consent). Matterport simply failed to draft language reflecting its intent. And as with optimal deterrence theory, efficient contracting theory would support awarding Brown damages equal to the actual costs Matterport imposed on him.[176]

### 3.  The Measure of Brown's Damages

An alternative to the highest intermediate price method is the average price over a reasonable period.[177] The "reasonable period" could be the amount of time

---

[174] Fried Report ¶ 103; Subramanian Report ¶ 43.

[175] Brown and Legacy Matterport were parties to a stock option agreement. That contract does not implicate efficient contracting theory in this case because there is no claim that it was breached. Subramanian Phase 2 Tr. 949; Fried Phase 2 Tr. 1022-23. Moreover, Brown's stock option agreement reflected his agreement to be subject to a six-month lockup in the event of an IPO. JX 12 at 17-18; JX 7 at 17-18; *see* Fried Phase 2 Tr. 1023.

[176] *See* Fried Phase 2 Tr. 1024-25; *see also* JX 1397 ¶¶ 7-12; Subramanian Report ¶ 31 n.26, ¶¶ 45-46 & n.38; *cf. Leaf Invenergy Co. v. Invenergy Renewables LLC*, 210 A.3d 688, 703 (Del. 2019) (explaining that "efficient-breach theory recognizes that 'a party may find it advantageous to refuse to perform a contract if he will still have a net gain after he has fully compensated the injured party for the resulting loss'").

[177] *See* Subramanian Report ¶ 42; Fried Phase 2 Tr. 1015; Subramanian Phase 2 Tr. 951; *see also Lawrence Fund, L.L.P. v. Helionetics, Inc.*, 1996 WL 352911, at *6 (S.D.N.Y. June 25, 1996) (calculating damages based on the average price of the stock during the period in which the plaintiffs would have reasonably sold their shares); *cf. Commonwealth Assocs. v. Palomar Med. Techs.*, 982 F. Supp. 205, 207-09 (S.D.N.Y. 1997) (basing damages on the daily stock price over the course "of the two-week period during which

needed to sell shares without putting downward pressure on the stock price or to sell shares as a block.[178]  The goal is to fairly compensate the injured party for losses incurred while accounting for market fluctuations.  Applied here, the approach considers the average price Brown would have received if his shares were sold evenly over a hypothetical reasonable trading period.[179]  It provides Brown recompense for any lost profits he would have obtained had he been free to trade upon receiving his Matterport shares.

The record enables a fair approximation of when Brown would likely have begun trading absent the lockup and the time period across which he would have traded.  The evidence and Phase One Opinion support treating November 22, 2021 as the start of the trading period.  Applying a participation rate of 20%, Brown would have sold his stake by November 29.  The average market price of Matterport's stock during these five trading days is $27.92.  Less the amount Brown received when he sold his shares in January 2022, he is entitled to $79,092,133.12 in damages.

---

[the court] assume[d] the plaintiff would have sold the shares" rather than the highest intermediate price where the record contained persuasive evidence of the plaintiff's trading strategy).

[178] Subramanian Report ¶ 41.

[179] *Id.* ¶ 42.

a.      Initial Trading Day

The first step in assessing Brown's damages is to determine when a reasonable trading period began. Brown submitted letters of transmittal to AST on November 9 and November 19.[180] On Thursday November 18, Brown received all 5,713,441 shares of his Matterport Class A common stock, which were placed into his AST account in book entry form.[181] The accompanying book entry advice stated that Brown's shares were subject to the transfer restriction in Section 7.10 of the A&R Bylaws.[182] Had that not been so, by Friday November 19, Brown could have requested that the shares be transferred to his brokerage account—a process that would take one or two days.[183] Brown could realistically have begun trading as early as Monday November 22 had his shares not been restricted.

Brown advocates for a slightly later start to the reasonable trading period. He testified that on Saturday November 27, he "received" the AST book entry advice

---

[180] *See* JX 1069; JX 1095; JX 1098; JX 1103; JX 1112; JXs 1114-15; *see also* Phase 2 PTO ¶¶ 79-81.

[181] *See* JX 402 (reflecting that 5,713,441 shares of Matterport Class A common stock were in Brown's AST account in book entry form as of November 18, 2021); JX 1095 (same); Phase 2 PTO ¶ 82; *see also* JX 527 at 2 (Brown's counsel stating that "Mr. Brown did not receive the 5,713,441 shares until November 18, 2021"); *supra* note 75.

[182] JX 1095. The book entry advice was mailed on November 22 but the shares were already in Brown's AST account by then. *See supra* note 181.

[183] *See* Augenblick Phase 2 Dep. 111; *cf.* JX 527 (demanding that shares be transferred to Brown's brokerage account).

that had been mailed on November 22.[184]  He therefore maintains that Monday November 29 should be deemed the first day on which trading could have commenced absent the lockup.  I reject this approach for two reasons.

First, though I have no reason to doubt that Brown physically received the paper book entry advice around November 27, I find it difficult to accept that he was oblivious to the receipt of his shares before then.[185]  Brown was singularly focused on making an optimal trade—spending hundreds of hours developing a predictive model, researching various trading strategies, and even moving his family to a tax haven in preparation for a sale.[186]  In the context of this record, I would have expected that Brown was obsessively checking the mail and his AST account after sending letters of transmittal.  It seems unlikely that a week went by without Brown or his advisors realizing that millions of shares were in his possession.

Second, to begin a reasonable trading period based on the time one gets his mail injects needless variability and perverse incentives into the damages

---

[184] Brown Phase 1 Tr. 32 ("I received [the book entry advice] – it was sent to my home address in Puerto Rico, and I received it on November 27th.").  Brown argues in his post-trial brief that on November 27, "the mail was retrieved and [he] learned of the notice from AST."  Pl.'s Post-trial Opening Br. 16.  There is no support in the record for these specifics, though I suppose his testimony about "receiv[ing]" the book entry advice could mean that he or someone else collected his mail on that date.

[185] Brown acknowledged that he received his Matterport shares before November 27. Brown Phase 2 Tr. 137.

[186] *See supra* notes 52-54 and accompanying text; *see also* JX 1068; JX 1071.

calculation. The risk of slow mail service or human delays in collecting mail cannot fairly be shifted to Matterport. Fashioning a recovery based on when Brown learned about his receipt of the shares (rather than when those shares were received) would also endorse a hindsight driven approach to maximizing damages. It is not lost on me that Brown's timing sweeps in the December 1 all-time high trading price.[187]

Matterport's proposal suffers from even greater flaws than Brown's. Matterport maintains that Brown would have begun selling his shares shortly after the July 21, 2021 de-SPAC merger.[188] The reasonable period for trading, according to Matterport, began by late July or early August 2021. The share price during this time was around $15 per share—well below the $20 to $30 range in November 2021 when Brown made his transfer requests.[189]

The factual and litigation record indicate that Brown wished to obtain his shares in tradeable form promptly upon the closing of the business combination.[190]

---

[187] *See* JX 1519 at 3. Applying the highest intermediate price framework with Brown's purported hypothetical start date of November 29 would yield proceeds of $214,825,382 ($37.60 multiplied by 5,713,441 shares) and, less his January proceeds ($80,427,139.60) net damages of $134,398,242. This further indicates that the highest intermediate price framework is unsuited for this case where sufficient evidence permits a more accurate assessment tailored to the likely losses. *Cf. Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 146 (Del. 2009) ("[D]amages should not act as a windfall."); *supra* note 164.

[188] Defs.' Post-trial Br. (Dkt. 317) 42-43.

[189] JX 1519 at 1.

[190] Defs.' Post-trial Br. 43-44; *see* JX 854 at 9; Augenblick Phase 2 Dep. 147-48; JX 240 at 7, 12. The fact that Brown wanted to receive his shares "as soon as possible" is not a commitment to sell in July or August. *See* JX 854 at 9. He was consistent in his desire to ascertain the optimal time to trade. *See, e.g.*, JX 1071 (reflecting Brown's ongoing

But that is not what happened. Brown opted not to send a letter of transmittal to AST in July.[191] Nor did he receive his shares in August. If he had, he would likely have held Lockup Shares under the A&R Bylaws and *could not* have traded. He may well then have lost the phase one trial, which would obviate the need for a damages assessment entirely.

In July 2021, Brown "held only the right to receive Matterport Class A common shares."[192] He invoked his appraisal rights for certain shares as part of a hedging strategy.[193] He waited until November 2021 to send letters of transmittal to AST and received his Matterport shares that month.[194] His shares were not Lockup Shares as a result.[195] Given these facts and the findings of the Phase One Opinion, November 22 is the most realistic first day that Brown could have traded his Matterport shares had they lacked a restrictive legend.

---

modeling of the ideal timing); JX 1068 (same); JX 240 at 7 (stating that Brown "would have sold all shares he held in Matterport at the highest possible trading prices, including on or around August 10, 2021").

[191] This is true not only for the shares that became subject to an appraisal demand but also the shares that did not.

[192] Phase 1 Mem. Op. 9.

[193] *See* Brown Phase 2 Tr. 121-22; *see also* Brown Phase 1 Dep. 77, 89, 117; Brown Phase 2 Dep. 550, 554; *supra* note 191 and accompanying text.

[194] Phase 1 Mem. Op. 10 n.39.

[195] *Id.* at 10 ("Roughly three and a half months elapsed between the business combination closing and the date Brown possessed any Matterport shares. Obtaining shares over 100 days after closing is not 'immediately.'").

### b. Participation Rate

The next step in setting a reasonable trading period is to consider the aggressiveness of Brown's likely trades over a time horizon. To do so, I consider the volume of shares a trader would rationally sell in the market as a percentage of the total trading volume—known as the "participation rate."[196] The targeted participation rate is a key input in estimating a "reasonable period . . . during which [a] stockholder[] could have sold the[ir] shares."[197]

A trader's participation rate drives the speed of a trade; the higher the participation rate, the faster a trade is completed.[198] Faster is not always better. A higher participation rate poses an increased risk of negatively affecting the stock price, particularly when a large trade relative to a stock's average volume is executed.[199] This is because market participants react to a trader's injection of additional shares into the market, signaling a sell-off to informed market participants that requires a discount in sale price to attract new buyers.[200] Because there is no

---

[196] JX 1394 (Rebuttal Expert Report of Cristian Zarcu) ("Zarcu Rebuttal Report") ¶ 19.

[197] *Duncan*, 775 A.2d at 1023; *see* Zarcu Rebuttal Report ¶ 19.

[198] Zarcu Rebuttal Report ¶ 19.

[199] *See* JX 1388 (Expert Report of Cristian Zarcu) ("Zarcu Opening Report") ¶¶ 30, 75; *see also* Investment Technology Group, *Below the Waterline: Uncover Hidden Transaction Costs Throughout the Investment Process* 38-39 (2009).

[200] Zarcu Opening Report ¶ 52.

industry standard participation rate, it is a matter for the trader's discretion in view of market conditions and client goals.[201]

The parties' experts proffer competing target participation rates. Brown's expert Greg Kyle—an investment management consultant—used a square root market impact model that achieved a target participation rate of 10%.[202] Matterport's expert Cristian Zarcu—a former sell-side trader—relied on three algorithmic trading strategies to simulate scenarios using a 20% target participation rate.[203] I adopt the latter rate.

Kyle's use of a 10% target participation rate is unsupported by quantitative analysis, Brown's trading goals in November 2021, or market factors during the relevant trading period.[204] The square root market impact model offered to support a 10% participation rate was later abandoned.[205] Kyle conceded that a 10% participation is neither an industry standard nor a "hard-and-fast rate."[206] He acknowledged that the appropriate rate depends on market dynamics and the client's

---

[201] Zarcu Phase 2 Tr. 1119; Kyle Phase 2 Tr. 515.

[202] *See* JX 1389 (Expert Report of Greg A. Kyle) ("Kyle Opening Report") ¶¶ 47-49.

[203] Zarcu Opening Report ¶¶ 19, 76.

[204] *See* Kyle Phase 2 Tr. 523-28.

[205] Kyle Phase 2 Dep. 32, 34; Kyle Phase 2 Tr. 506-12.

[206] Kyle Phase 2 Tr. 512.

desired trading speed, but his selection of a 10% participation rate was made without regard to either.[207]

Zarcu's participation rate, by contrast, is supported by evidence and analysis. He chose a 20% participation rate because it aligns with Brown's stated objective of quickly liquidating his Matterport position while limiting price impact.[208] This rate is consistent with that used by Rockwood when liquidating Brown's Matterport shares in January 2022.[209] Zarcu's approach is also supported by a pre-trade cost model that tested the effects of a 20% participation rate on Matterport's stock. The model revealed that a 20% participation rate would result in lower trading costs than a lower participation rate (such as 10%).[210]

c.  Reasonable Trading Period

Beginning with November 22, 2021 and applying a 20% participation rate, I proceed to set the length of a reasonable trading period. To do so, I consider (1) the

---

[207] *Id.* at 513, 523-28; *see also* Kyle Phase 2 Dep. 22, 106-07, 243-44. I question whether it was chosen to reach the December 1 all-time high Matterport stock price.

[208] Zarcu Opening Report ¶ 73; Zarcu Phase 2 Tr. 1067-68, 1086. Brown was unwilling to expose himself to the risk of a price decline any longer than necessary. *See* Brown Phase 2 Tr. 321-22, 326; *see also* Augenblick Phase 2 Dep. 126-27.

[209] The participation rate used in January 2022 to sell Brown's shares after the Phase One Opinion was approximately 17% of the total market volume, with a daily average participation rate of 19.75%. *See* Augenblick Phase 2 Dep. Tr. 113-14 (19% participation rate on January 11); *id.* at 118 (15% participation rate on January 12); *id.* at 124 (18% participation rate on January 13); *id.* at 129 (27% participation rate on January 14 when a small number of remaining shares were sold).

[210] JX 1405 ¶ 30; Zarcu Phase 2 Tr. 1087-88; *see supra* note 204.

maximum shares that Brown could sell per trading day and (2) the total amount of time needed to sell his stake.

The maximum shares that could be sold per day can be calculated by multiplying the average daily trading volume by the participation rate.[211] Traders often use an average daily volume (ADV) that accounts for historical patterns.[212] An ADV is particularly useful when assessing stocks with lower market capitalization (like Matterport) that are expected to have greater volatility in their daily volume.[213]

Kyle considered the ADV for the month preceding the start of the hypothetical trading period, compared to the 20-day rolling ADV endorsed by Zarcu.[214] Kyle's static, one month approach appears objective and both experts agreed that using a longer period smooths variations in daily volume.[215] Using the November 22 start date, the 30-day ADV (October 19 to November 19, 2021) is 5,742,539 shares. This total multiplied by a 20% participation rate indicates that a maximum of 1,148,508

---

[211] *See* Kyle Opening Report ¶¶ 35, 42, 44, 47, 49; Zarcu Opening Report ¶¶ 40, 77; *see also* JX 1390.

[212] Zarcu Opening Report ¶ 38.

[213] *Id.* (citing Robert Kissel & Morton Glantz, *Optimal Trading Strategies: Quantitative Approaches for Managing Market Impact and Trading Risk*, 40-41 (2003)).

[214] *Compare* Kyle Opening Report ¶ 43, *with* Zarcu Opening Report ¶ 38. Zarcu offers fair criticism of the use of a static ADV since a rolling ADV is more aligned with Brown's goal of trading in response to the market. Zarcu Rebuttal Report ¶¶ 42-45. Zarcu did not, however, provide a rolling ADV analysis for November 2021.

[215] Zarcu Opening Report ¶ 38; Kyle Opening Report ¶ 43; *see* Kyle Phase 2 Tr. 455-56.

Matterport shares could be sold per day.[216]  Since Brown owned 5,713,441 shares of Matterport stock, it would take him approximately 4.9 business days to liquidate his position.[217]  The reasonable trading period for purposes of calculating Brown's losses is November 22 to 29, 2021.[218]

### d.  Volume Weighted Average Price

Finally, I set Brown's damages based on the average price during the five trading days in the reasonable trading period.  The approximate historical Matterport stock prices and trading volumes for these days are as follows:

| Date | Open | High | Low | Close | Volume |
|---|---|---|---|---|---|
| 11/22/21 | 28.970 | 29.800 | 25.720 | 26.050 | 7,933,029 |
| 11/23/21 | 26.000 | 27.800 | 25.010 | 25.950 | 6,102,896 |
| 11/24/21 | 25.730 | 28.680 | 25.270 | 28.490 | 5,373,240 |
| 11/26/21 | 27.250 | 28.460 | 26.210 | 27.270 | 3,724,555 |
| 11/29/21 | 28.464 | 33.480 | 27.720 | 33.050 | 18,823,178 |

[216] The calculation is as follows: (average daily trading volume: 5,742,539) * (participation rate: 20%) = 1,148,508 shares per day.

[217] This figure is calculated by: (Brown's shares: 5,713,441) / (shares sold per day: 1,148,508) = 4.9 days (11/22/21 – 11/29/21).  Like Brown's actual trading period in January 2022, this hypothetical trading period spans four full days with Brown trading the remainder of his shares during a fifth day.  *See* Zarcu Opening Report ¶ 76 n.77; *supra* note 209.

[218] I take judicial notice of the fact that the markets were closed on November 25, 2021 for the Thanksgiving holiday and open for a partial day on November 26.  *See* Nasdaq, *Trading Calendar 2021*, https://www.nasdaq.net/PublicPages/assets/MyMID/Trade_Calendar_20 21.pdf (last visited May 24, 2024).  Because these days fell within the hypothetical trading period, Brown could not have completely exited his position until November 29.

Given the size of Brown's position, it would be an oversimplification to calculate damages by averaging the closing prices.[219] Trading decisions for a large trade over a time horizon are generally driven by intraday movement.[220] Any number of intraday events—from a company's press release to global news—can cause market volatility.[221]

Trading strategies based on certain indicators are used to execute intraday equity transactions. Three of the most common are the volume weighted average price (VWAP), time weighted average price (TWAP), and percent of volume (POV).[222] These measures are useful when a trader looks to sell a block of shares while minimizing price impact.[223]

The VWAP is a popular benchmark that accounts for both volume and price to reflect the average price a security trades at throughout the day.[224] It is considered

---

[219] Taking the average closing price effectively ignores that the sale of a large position involves intraday trades while the price and volume of shares in the marketplace fluctuate. *See* Zarcu Opening Report ¶¶ 60-61; Zarcu Phase 2 Tr. 1076-78.

[220] Zarcu Phase 2 Tr. 1076-78, 1250-51.

[221] Zarcu Opening Report ¶ 50; Zarcu Phase 2 Tr. 1077.

[222] Zarcu Opening Report ¶ 34.

[223] *See id.* ¶ 61; Kissel & Glantz, *supra* note 213, at 196 ("[T]raders often attempt to disguise the true size of the order by slicing the order into smaller pieces and executing over a period of time rather than all at once. The market can usually absorb these smaller slices resulting in reduced market impact cost.").

[224] Zarcu Opening Report ¶ 35; *see* Kissel & Glantz, *supra* note 213, at 275.

47

by Wall Street to be a reliable indicator of a stock's true average price.[225] The TWAP captures the average price a trader would expect to receive if sales were made evenly over a set period.[226] Unlike VWAP, TWAP does not consider volume.[227] The POV involves executing a percentage of the traded volume of a security over the duration of a trading period.[228] Unlike VWAP and TWAP strategies, a POV strategy adapts to actual trading volume as opposed to expected volume based on a rolling average.[229]

A VWAP trading strategy is consistent with Brown's goal to sell fast while limiting price impact. It was used by Rockwood when trading Brown's shares in January 2022.[230] From a more practical standpoint, the most reliable data before me is the average price based on the VWAP benchmark. Kyle's analysis includes historical VWAP (but not TWAP or POV) data and Zarcu's algorithmic analysis

---

[225] Zarcu Opening Report ¶ 35; Kissel & Glantz, *supra* note 213, at 275 ("[VWAP] is believed by market participants to be an indication of 'average' and 'fair' price over [a given trading period.]"). The average price is calculated by dividing the dollar value of each transaction over a defined time period by the total number of shares traded over that period.

[226] Zarcu Opening Report ¶ 41; Zarcu Phase 2 Tr. 1099. TWAP is calculated by averaging a stock's opening, high, low, and closing price within a given interval and then calculating the average of these averages for the number of intervals.

[227] Zarcu Opening Report ¶ 42.

[228] *Id.* ¶ 44; Zarcu Phase 2 Tr. 1100-01.

[229] Zarcu Opening Report ¶¶ 45-46; Zarcu Phase 2 Tr. 1254. Notably, traders using a POV algorithm will often look to achieve the VWAP for a given interval. *See* Zarcu Opening Report ¶ 44 n.39.

[230] *See* Augenblick Phase 2 Tr. 403-04.

excludes November 2021 trading periods. Using Kyle's November 2021 data, the average price from November 22 to November 29 based on the VWAP is $27.92 per share.[231]

Multiplying the number of Brown's shares (5,713,441) by the average price during the reasonable trading period ($27.92) yields total proceeds of $159,519,272.72.[232] This calculation assumes a first trading day of November 22, 2021 and a 20% participation rate. Subtracting the $80,427,139.60 Brown received from selling his shares in January 2022, net damages are $79,092,133.12.[233]

### 4. Pre- and Post-judgment Interest

"Delaware courts award prejudgment interest as a matter of right."[234] Pre-judgment interest is awarded to "compensate plaintiffs for losses suffered from the

---

[231] Kyle and Zarcu's models include the same historical VWAP data for trading days from November 22 to 29, 2021. The data used by each expert is identical. *Compare* JX 1390, *with* JX 1398. The data is as follows:

| 11/22/21 | 27.32 |
|----------|-------|
| 11/23/21 | 26.01 |
| 11/24/21 | 27.72 |
| 11/26/21 | 27.12 |
| 11/29/21 | 31.42 |

The average VWAP for this period is 27.92.

[232] The calculation is: (5,713,441 shares) * ($27.920 VWAP) = $159,519,272.72

[233] This is calculated by: $159,519,272.72 – $80,427,139.60 = $79,092,133.12.

[234] *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 620 (Del. Ch. 2010), *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010).

inability to use the money awarded during the time it was not available."[235] Delaware law recognizes that a "successful plaintiff is entitled to interest on money damages as a matter of right from the date liability accrues."[236]

Brown asks the court to award pre-judgment interest on two tranches of funds. First, he seeks interest on his actual proceeds ($80,427,139.60), running from the date he could have first sold his shares to the date he received his proceeds in January 2022.[237] Second, he requests interest on his damages ($79,092,133.12), running from the date he could have first sold his shares to the entry of judgment.[238]

I decline to grant interest on Brown's actual proceeds, which are not the subject of this decision and were credited against Brown's damages. To award interest on those proceeds would flout the compensatory and disgorgement purposes of pre-judgment interest.[239] It also risks double counting by awarding interest twice for the same claim where Brown mitigated his losses by selling his shares in January 2022 before the lockup expired.

---

[235] *Underbrink v. Warrior Energy Servs. Corp.*, 2008 WL 2262316, at *19 (Del. Ch. May 30, 2008) (citation omitted).

[236] *Summa Corp. v. Trans World Airlines, Inc.*, 540 A.2d 403, 409 (Del. 1988) (citation omitted).

[237] Pl.'s Post-trial Opening Br. 63.

[238] *Id.*

[239] *See Moskowitz v. Mayor & Council of Wilm.*, 391 A.2d 209, 210 (Del. 1978) ("As a general rule, interest accumulates from the date payment was due the plaintiff, because full compensation requires an allowance for the detention of the compensation awarded and interest is used as a basis for measuring that allowance." (citation omitted)).

Pre-judgment interest is, however, warranted on Brown's damages of $79,092,133.12 and began to accrue as of November 22—the day Brown could reasonably have started trading absent restrictions. Brown is also entitled to post-judgment interest.[240]

This court generally looks to the legal rate of interest in 6 *Del. C.* § 2301 to "benchmark" the pre- and post-judgment interest rate.[241] The legal rate of interest is 5% over the Federal Discount Rate.[242] The Federal Discount Rate as of November 22, 2021 was 0.25%, making the legal rate of interest 5.25% while Brown was prevented from trading.[243] Accordingly, Brown is entitled to pre- and post-judgment interest at a rate of 5.25%. Interest from November 22, 2021 to the date of payment will be compounded quarterly.[244]

---

[240] *Wilm. Country Club v. Cowee*, 747 A.2d 1087, 1097 (Del. 2000) ("Delaware law provides that Post–Judgment Interest is a right belonging to the prevailing plaintiff and is not dependent upon the trial court's discretion.").

[241] *Murphy Marine Servs. of Del., Inc. v. GT USA Wilm., LLC*, 2022 WL 4296495, at *24 (Del. Ch. Sept. 19, 2022) (citing *Trans World Airlines*, 540 A.2d at 409); *see Taylor v. Am. Specialty Retailing Gp., Inc.*, 2003 WL 21753752, at *12 (Del. Ch. July 25, 2003); 6 *Del C.* § 2301 (providing that the legal rate of interest is 5% over the Federal Discount Rate).

[242] 6 *Del C.* § 2301.

[243] Nasdaq, *Federal Discount Rate (DISC) Historical Data*, https://www.nasdaq.com/market-activity/fixedincome/disc/historical?page=7&rows_per_page=100&timeline=y5 (last visited May 24, 2024).

[244] *Murphy Marine*, 2022 WL 4296495, at *24 (explaining that compounding interest "reflects the financial realities of conducting business"); *Doft & Co. v. Travelocity.com Inc.*, 2004 WL 1152338, at *12 (Del. Ch. May 20, 2004) (explaining that when the court "award[s] the legal rate of interest, the appropriate compounding rate is quarterly").

## III. CONCLUSION

For the reasons described in the Phase One Opinion, judgment on Count I was entered for Brown. For the reasons described above, Brown is awarded $79,092,133.12 plus pre- and post-judgment interest. Counts II and IV are entered for the defendants. The parties are directed to confer on a form of final order, which must be filed within 30 days.